**LEXINGTON INSURANCE COMPANY, Appellant,**

v.

**Ted GRAY, Jr., et al., Appellees.**

**No. 3–88–141–CV.**

Court of Appeals of Texas, Austin.

June 28, 1989.

Rehearing Denied Sept. 13, 1989.

Michael Klein, Fulbright & Jaworski, Austin, for appellant.

Walter Mizell, John E. Gangstad, Brown Maroney & Oaks Hartline, Austin, for appellees.

Before POWERS, EARL W. SMITH * and JONES, JJ.

JONES, Justice.

This appeal arose out of a declaratory judgment action filed by Ted Gray, Jr., appellee, against Lexington Insurance Company, appellant, to determine Gray's liability as guarantor of a promissory note. Additional guarantors, Katherine Berkeley Reynolds, Valerie Jane Hickie, and Division One, a Texas General Partnership, intervened in the trial court on the side of Gray and are now appellees. All appellees will be referred to collectively as "guarantors." The trial court granted the guarantors' motions for partial summary judgment, declaring that they had no liability to Lexington. The parties stipulated as to attorney's fees and severed other claims in the lawsuit, whereupon the trial court entered the final judgment from which Lexington appeals. We will reverse the judgment of the trial court and remand the cause.

The material facts are not in dispute. In December 1983, InterFirst Bank of Austin, N.A. ("Bank") loaned Mississippi Lofts, Inc. $450,000 to purchase a building in St. Louis, Missouri. Mississippi Lofts executed a promissory note payable to the Bank, as well as a deed of trust on the property to secure payment of the note. In addition, the guarantors executed agreements which guaranteed prompt and full payment of the promissory note. As required by the deed of trust, Mississippi Lofts obtained, from Lexington, an insurance policy covering various types of damage to the premises, including fire. The policy contained a "standard mortgage clause," under which any reimbursement by Lexington for loss or damage would be payable to the "mortgagee (or trustee) as [its] interest may appear, and this insurance, as to the interest of the mortgagee (or trustee) only therein, shall not be invalidated by any act or neglect of the mortgagor or owner of the within described property." The standard mortgage clause also provided that

[w]henever this Company shall pay the mortgagee (or trustee) any sum for loss or damage under the policy and shall claim that as to the mortgagor or owner, no liability therefore existed, this Company shall to be extent of such payment, be thereupon legally subrogated to all the rights of the party to whom such payment shall be made, under all securities held as collateral to the mortgage debt, or may at its option, pay to the mortgagee (or trustee) the whole principal due or to grow due on the mortgage with interest accrued thereon to the date of such payment, and shall thereupon receive a full assignment and transfer of the mortgage and on all such other securities.

On or about October 13, 1984, while the insurance policy was still in full force and effect, the subject property was destroyed by fire. Mississippi Lofts made a claim for loss under the policy, which Lexington denied on the ground of arson.

Mississippi Lofts sued Lexington in the United States District Court for the Eastern District of Missouri, claiming a right to the insurance proceeds under the policy. After a jury trial, the federal district court entered judgment that the fire had indeed been intentionally set by agents of Mississippi Lofts, and accordingly decreed that Mississippi Lofts take nothing by its suit. See Mississippi Lofts, Inc. v. Lexington Insurance Co., 653 F.Supp. 345 (E.D.Mo. 1986). That judgment was upheld by the United States Court of Appeals for the Eighth Circuit. See Mississippi Lofts, Inc. v. Lexington Insurance Co., 841 F.2d 251 (8th Cir.1988).

Simultaneously, the Bank filed this suit against Lexington and Gray, claiming that (1) the Bank was entitled to the insurance proceeds under the Lexington policy, and (2) Gray was liable to the Bank under his guaranty agreement. On February 15, 1985, eight days after suit was filed, Lexington paid the Bank $530,103.75, representing the whole principal due on the note,

---

* Before Earl W. Smith, Justice (retired), Third Court of Appeals, sitting by assignment. See

Tex.Gov't.Code Ann. § 74.003 (1988).

with interest. Following payment, the Bank dismissed its claims and executed an "Assignment" and an "Assignment of Deed of Trust," the former of which provides as follows in pertinent part:

That upon payment of the total amount as referred to above [$530,103.75] on or about February 15, 1985, the undersigned InterFirst Bank Austin, N.A. does hereby transfer, assign, and set over unto the insuror [sic], Lexington Insurance Company, all right, title, interest, causes of action or any other rights InterFirst Bank Austin, N.A. may have in said mortgage and all other such securities as provided in the standard mortgage clause referred to above and agrees to assign the mortgage and all other such securities which are held as collateral to the mortgage debt to the insuror [sic], Lexington Insurance Company.

Meanwhile, Lexington and Gray cross-claimed against each other, Lexington for a recovery under the assignment and Gray for a declaratory judgment that he was not liable under his guaranty agreement. Reynolds, Hickie, and Division One intervened seeking similar declaratory relief, whereupon Lexington counterclaimed against them to recover under the assignment.

The guarantors filed motions for summary judgment. The parties stipulated—for purposes of the summary judgment proceeding only—that Lexington was the "holder" of the Mississippi Lofts note. The trial court declared that the guarantors were not liable to Lexington on their guaranties, and ruled that Lexington take nothing by its claims against them. Although the trial court's judgment does not specify its grounds for the summary judgment, the parties presented three issues in their motions, responses, and briefs to the court below: (1) whether the doctrines of subrogation and/or assignment impose liability on the guarantors under these circumstances, (2) whether the order dismissing the Bank's claims had the effect of discharging and extinguishing the debt guaranteed by the guarantors, and (3) whether Lexington is collaterally estopped by virtue of the judgment of the United States District Court for the Eastern District of Missouri from asserting the guarantors' liability. In its single point of error before this Court, Lexington addresses all three of these issues.

We note at the outset the well-established standards for granting a summary judgment:

1.  The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

2.  In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true.

3.  Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.

*Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985).

We note also that since the Mississippi Lofts note provides for a variable interest rate tied to a fluctuating "base rate" established by the Bank, the note apparently is not a "negotiable instrument" as that term is defined in the Uniform Commercial Code. *See* Tex.Bus. & Com. Code Ann. § 3.104(a) (Vernon 1968). Nor are the guaranties themselves negotiable instruments. Accordingly, general principles of contract law will govern this case. Even a "non-negotiable" contract, however, is *assignable* if it does not involve personal trust or confidence and if it does not contain language limiting its assignability. *First National Bank v. Lone Star Life Insurance Co.,* 524 S.W.2d 525 (Tex.Civ. App.), *writ ref'd n.r.e.,* 529 S.W.2d 67 (Tex. 1975). Those limiting factors are not present in the Mississippi Lofts note, and the guaranty agreements expressly permit their assignment.

## SUBROGATION/ASSIGNMENT

The guarantors' position on the subrogation/assignment issue, before both the trial court and this Court, is summed up in their brief as follows:

(i) [T]he assignment of the note from the bank to Lexington gives it no greater rights than it would have under principles of equitable subrogation, (ii) under principles of equitable subrogation, the subrogee insurance carrier cannot recover against a third party unless the subrogee's equities are superior to the equities of the third party, and (iii) that, as a matter of law, the equities of appellees (who, as the uncontroverted summary judgment proof indicates, were in fact "innocent" of any participation in the alleged arson which gave rise to the loss) are superior to the equities of Lexington. . . .

Lexington's primary challenge, with which we agree, is to the first premise stated above.

Although often confused, the doctrines of subrogation and assignment are not the same:

> Subrogation is the act of the law, depending not upon contract, but upon the principles of equity, while assignment is the act of the parties, and depends generally on intention. Subrogation presupposes an actual payment and satisfaction of the debt or claim to which the party is subrogated, although the remedy is kept alive in equity for the benefit of the one who made the payment under circumstances entitling him to contribution or indemnity, while assignment necessarily contemplates the continued existence of the debt or claim assigned. Subrogation operates only to secure contribution and indemnity, whereas an assignment transfers the whole claim.

6A C.J.S. *Assignments* § 5, at 597 (1975).

■ It is settled law in Texas that a standard mortgage clause such as the one in Lexington's policy is valid and enforceable in accordance with its express terms. *British American Assur. Co. v. Mid–Continent Life Ins. Co.*, 37 S.W.2d 742 (Tex. Comm'n App.1931, judgm't adopted); *Boatner v. Home Ins. Co.*, 239 S.W. 928 (Tex. Comm'n App.1922, judgm't adopted). Its effect is to make an independent contract between the mortgagee and the insurance company. *See Citizens State Bank v.*

*American Fire & Cas. Co.*, 198 F.2d 57 (5th Cir.1952).

The clause provides for two options in the event of damage to the property securing the indebtedness to the mortgagee, under circumstances in which the insurer has no liability to the mortgagor: (1) the insurance company may pay to the mortgagee the amount of the loss or damage, and thereupon be "legally subrogated to all the rights of the party to whom such payment shall be made, under all securities held as collateral to the mortgage debt"; or (2) the insurer may pay the entire principal due or to become due on the note, with interest, and thereupon "receive a full assignment and transfer of the mortgage and on all such other securities."

The first option stated above is an example of what has been called "conventional subrogation," i.e., subrogation that arises by contract, as distinguished from what has been called "legal subrogation," i.e., that which arises by operation of law. *Cf. Ramey v. Cage*, 90 S.W.2d 626 (Tex.Civ. App.1935, no writ) (discussing the distinction between the two). There is no question that legal subrogation is a creature of equity and is governed by principles of equity. *Galbraith–Foxworth Lumber Co. v. Long*, 5 S.W.2d 162 (Tex.Civ.App.1928, writ ref'd); *see also United States Fidelity & Guaranty Co. v. First Nat. Bank*, 172 F.2d 258 (5th Cir.1949). It is also true that some jurisdictions regard the distinction between legal and conventional subrogation as merely procedural, such that an agreement that one party will be subrogated to the rights of another upon payment for a loss gives the subrogee no additional rights that it would not have under equitable principles. *See, e.g., Garrity v. Rural Mutual Insurance Co.*, 77 Wis.2d 537, 253 N.W.2d 512 (1977).

■ Texas courts, however, have given more substance to the distinction, generally allowing a subrogee claiming against a third party under conventional subrogation to recover without regard to the relative equities of the parties. *See Girard Fire & Marine Ins. Co. v. Farmer*, 53 S.W.2d 1016 (Tex.Comm'n App.1932, judgm't adopted);

*Duval County Ranch Co. v. Alamo Lumber Co.*, 663 S.W.2d 627 (Tex.App.1983, writ ref'd n.r.e.); *Quincy Mutual Fire Insurance Co. v. Jones*, 486 S.W.2d 126 (Tex. Civ.App.1972, no writ); *F.H. Vahlsing, Inc. v. Hartford Fire Insurance Co.*, 108 S.W.2d 947 (Tex.Civ.App.1937, writ dism'd w.o.j.). Such holdings are in accord with the unusually "hospitable" treatment that the right of subrogation has historically received in Texas. *See Faires v. Cockrill*, 31 S.W. 190, 194 (Tex.1895) ("Perhaps the courts of no other state have gone further in applying the doctrine of subrogation than has the court of this state....").

Further evidence that Texas courts give considerable weight to express subrogation agreements is found in *Providence Institution for Savings v. Sims*, 441 S.W.2d 516 (Tex.1969), where money was advanced to discharge a prior mortgage, and a new mortgage was taken with the understanding that it would be a first lien on the property. In discussing whether the subrogee's constructive knowledge of an intervening lien would affect the outcome, the court stated that "[w]here purely equitable subrogation is the issue, each case is usually controlled by its own facts. In the present case, however, the right of subrogation does not depend entirely upon equitable principles. Nortex *expressly agreed* that Hughes Investment would be entitled to subrogation...." 441 S.W.2d at 519–20 (emphasis added).

Although the instant case does not fall within the first option of the standard mortgage clause, the attitude of Texas courts to conventional subrogation helps set the stage for a determination of how cases falling under the second option should be treated.

Under the second option, the parties have agreed that, upon payment of the entire mortgage debt, the insurer will receive a full assignment of the mortgage, including any "securities" for the debt. The parties have, in effect, agreed *in advance* that the matter will be governed by contract principles instead of equitable principles. Under those circumstances, there is no reason for

the equitable principles usually found in subrogation cases to come into play.

For example, in *Boatner*, under the second option of an identical standard mortgage clause, the court held the insurer entitled to have a mortgage note and lien transferred to it after paying the full balance due:

> After [the mortgagor] had rendered the policies void as to himself ... [the insurer] was entitled at any time to pay off the mortgage debt and receive a transfer of the notes and lien under the express terms of the subrogation provision of the mortgage clauses. The notes and lien were assignable in the hands of [the mortgagee] without the consent of [the mortgagor] independently of the subrogation clause; and when [the insurer] through its agent acquired the notes and lien, it stood, to the extent of the amount paid by it to the mortgagee, in the *same position as any other assignee*, holding the notes and lien subject to any defenses which might be urged against [the mortgagee].

239 S.W. at 930 (emphasis added).

The guarantors argue strenuously, however, that the position of a subrogee is not improved by a formal assignment from the insured, citing numerous cases from other jurisdictions. Two kinds of "assignments" in this context must be distinguished. The first is a specific assignment of a claim or chose in action against those causing or otherwise responsible for the loss or damage incurred by the insured. That kind of an assignment does not operate to transfer indemnification rights of the assignor arising solely from a pre-existing contract of indemnity. In effect, it transfers only the rights to which the insurer would, by law, have been subrogated anyway. The second kind of assignment is that in which the right assigned is not merely a chose in action against those causing the loss, but *all* rights to payment and indemnification held by the assignor, including those pursuant to a pre-existing contract. This is the kind of assignment effectuated by the second option in the

standard mortgage clause, and it is not dependent on principles of equity.

In addition, some jurisdictions have held that the subrogation and assignment rights of the insurer are effectively "fixed" at the time of the loss. Under this approach, if the insurer's subrogation rights under the policy—whether deriving from legal or conventional subrogation—would be governed by equitable principles, then an "after-the-fact" assignment cannot increase the subrogee's rights.

A representative statement of this rule is found in *Meyers v. Bank of America Nat. Trust & Savings Ass'n*, 11 Cal.2d 92, 77 P.2d 1084, 1086 (1938):

> [O]ne who asserts a right of subrogation, whether by virtue of an assignment or otherwise, must first show a *right in equity* to be entitled to such subrogation, or substitution, and that where such right is clearly shown by the application of equitable principles, an assignment adds nothing to his right thereto. Otherwise stated, where by the application of equitable principles, a surety has been found not to be entitled to subrogation, an assignment will not confer upon him the right to be so substituted in an action at law upon the assignment. His rights must be measured by the application of equitable principles in the first instance, his recovery being dependable upon a right in equity, and not by virtue of an asserted legal right under an assignment.

(Emphasis in original.) It must be remembered, however, that two important distinctions exist between *Meyers* and the instant case: First, the insurance policy in *Meyers* apparently contained no subrogation clause at all, so under the contract the insurer had only the equitable rights associated with legal subrogation. Second, the right actually assigned was simply "any cause of action of which he then was the owner *as against the defendant.*" 77 P.2d at 1085 (emphasis added). Accordingly, whether the *Meyers* rule or some variation thereof would be followed by Texas courts is not material to our decision in the instant case.

Each of the cases cited by the guarantors for the proposition that an assignment adds no rights not given under equitable principles involved either (1) an assignment of a claim or chose in action only against those responsible for the loss, or (2) an assignment made pursuant to a policy or agreement under which the insurer was only entitled to subrogation limited by principles of equity. None involved an assignment pursuant to an express agreement that, upon payment of a debt, a complete assignment of the indebtedness would be given.

That the language of the insurance policy is highly significant is exemplified by *National Fire Ins. Co. v. Maddox*, 224 Mo.App. 90, 20 S.W.2d 705 (1929), a case cited and relied on by the guarantors. There, the purchaser of a car gave a note and chattel mortgage to the seller, Maddox. Maddox then sold the note and mortgage to the mortgagee. Maddox guaranteed all payments "if not paid on due date." The mortgagee had an open policy of insurance issued by National Fire Insurance Company. The policy provided that any violation of the terms and provisions of the policy by the purchaser of the car would

> not waive the [mortgagee's] rights of recovery under the contract, but as regards any payment made under the stipulation they agree to subrogate to the [insurer] all their rights, with all securities held as collateral to such indebtedness.... [I]n the event of any loss the company, upon payment of the same, should be subrogated to the extent of such payment to all rights of the assured to collect the balance of purchase money, if any, still due upon the automobiles insured thereunder.

20 S.W.2d at 706.

The car was later stolen, and it was determined that the purchaser had violated the terms of the policy's "locking device clause," by which he had agreed not to leave the car without locking a special anti-theft device. The insurer then paid the mortgagee the amount of the unpaid balance on the note, and in return the mortgagee assigned to the insurer all of its

rights in the promissory note. The insurer filed suit on the note against the guarantor, Maddox.

In affirming the trial court's denial of recovery, the court first determined that the insurer was not entitled to recover from Maddox under the doctrine of legal subrogation, governed by general principles of equity, because the insurer's equities were not superior. The court then turned to the question of whether the express subrogation agreement contained in the policy allowed the insurer to recover from Maddox:

> [T]here would have been no infringement of the rights of Maddox had the [insurer] contracted with the [mortgagee] that, in the event the [insurer] should become liable to the [mortgagee], but not to the owner of the automobile who was the maker of the note, then on payment of the loss the insurance company should be entitled to an assignment of the note with the right to proceed against the maker and all persons secondarily liable. The express contract provided that in regard to any payment made under the stipulation the insured agreed to *subrogate* to the insurance company all its rights *with all securities held as collateral to such indebtedness;* and it was provided that upon such payment *the company shall be subrogated to the extent of such payment to all rights of the insured to collect the balance of the purchase money, if any, still due upon the automobiles insured thereunder.* This stipulation expressly contracts for subrogation, and not for an unconditional assignment of the note. An unconditional assignment would have carried with it the liability of the surety on the note, but subrogation carries with it only the right to fix liability upon him who is primarily liable.

20 S.W.2d at 708–09 (emphasis in original). Thus, it is clear that if the insurance policy in *Maddox* had contained the same express provision for an assignment of the note itself that the policy in the instant case contains, the court would have allowed the insurer to recover from Maddox, the "innocent" guarantor.

The guarantors cite us to four cases which they say are "directly on point" and compel a judgment in their favor. A careful review of these cases, however, convinces us that they are not controlling here. In *National Liberty Ins. Co. v. Watts*, 101 S.W.2d 1060 (Tex.Civ.App.1937, no writ), a loan had been made for the purchase of an automobile, the note being secured by a chattel mortgage. The policy of insurance procured to cover loss or damage to the car contained a loss payable clause, but it does not appear that it contained a standard mortgage clause. The maker of the note, together with the car, later disappeared. The insurer paid the balance due on the promissory note, and the mortgagee "assigned to [the insurer] the installment note together with all the rights of said mortgagee under all the securities held by him for the debt." 101 S.W.2d at 1061. The insurer then brought suit against the maker of the note as well as an indorser on the note. The maker of the note was subsequently dismissed, however, because he could not be found. The court of civil appeals affirmed a judgment denying the insurer any recovery against the indorser.

*Watts* is distinguishable from the instant case because there was no holding or other indication that the insurer was not liable on the policy to the mortgagor. This fact is critical under a standard mortgage clause: "[I]f the insurer is liable to the mortgagor, its payment to the mortgagee must be regarded as being in discharge of its obligation to the mortgagor and therefore a final payment, leaving no claim to which the insurer can be subrogated." 16 Couch on Insurance 2d, § 61.374, at 375 (Rev.Ed. 1983). Accordingly, where it appears that the policy is not void or unenforceable as to the mortgagor, any payment to the mortgagee by the insurer serves to extinguish the debt. There was no debt left for the mortgagee to assign. In this light, the court's holding in *Watts* is entirely consistent with the conclusion we reach.

The second case cited by the guarantors, *Merchants' Ins. Co. v. Story*, 13 Tex.Civ. App. 124, 35 S.W. 68 (1896, writ ref'd), is potentially the most directly on point. Un-

fortunately, the opinion in that case is so lacking in clarity as to the court's reasoning, and even as to its ultimate holding, that it is difficult to determine whether it truly offers support for the guarantors' position. That, combined with the fact that in its ninety-three year existence it has never been cited by any court for any proposition, leads us to discount its precedential value.

In the third case cited by the guarantors, *Wright v. North River Ins. Co.*, 23 F.2d 548 (5th Cir.1928) (construing Mississippi law), an insurer paid to the mortgagee the full amount of the mortgagee debt, and the mortgagee assigned to the insurer the note and deed of trust. The insurer then brought a suit *in equity* against the accommodation indorser on the note. In holding that the insurer was not entitled to recover from the indorser, the court emphasized that the deed of trust contained a special provision indicating that

> it was intended by the parties to the loan by the bank that the [indorser] as well as the bank [mortgagee] was to be a beneficiary of the deed of trust mentioned and of the statutory loss payable clause, that the insurance against fire of property conveyed as security, being a means of making good, in whole or in part, the loss by fire of such property, should inure to the benefit of the [indorser], as well as the bank [mortgagee], and that [the indorser] was to be entitled to require proceeds of the property conveyed as security or of insurance on that property received by the bank to be applied on the debt owing to the bank.

23 F.2d at 550. In the instant case, there is no such special provision. Nor is there any other conclusive showing that it was the intention of the parties that insurance proceeds paid to the Bank pursuant to the standard mortgage clause should inure to the benefit of the guarantors.

In the guarantors' fourth case, *American Cent. Ins. Co. v. Weller*, 106 Or. 494, 212 P. 803 (1923), a note and conditional sales contract were sold to the mortgagee, and the seller guaranteed the payments. The insurance policy on the car contained a loss payable clause, but apparently did not contain a standard mortgage clause. When the car was converted, the insurer paid the balance of the debt and took an assignment of the note and sales contract. The insurer then sued the guarantor under a theory of subrogation. In holding for the guarantor, the court stressed that the equities did not permit a recovery by the insurer, which was primarily liable, against the guarantor, which was secondarily liable: "When the insurance company paid the $300 on the policy the debt was satisfied to that amount as to [the guarantor], and could not be assigned." 212 P. at 807. This case holds only that a simple loss payable clause will not permit equitable subrogation of an insurer to the rights of the mortgagee against an "innocent" guarantor. Whether that proposition is the law in Texas is not material to our inquiry, since the controlling provision in the instant case is the standard mortgage clause.

■ In a case such as the present one in which the mortgagee has, pursuant to a standard mortgage clause, fully assigned the mortgage debt and collateral to an insurer that has paid the entire indebtedness, we conclude that the relative equities of the parties have little, if any, effect on the right of the insurer to recover from a third party which owes the mortgagee indemnity but which was innocent of any negligence or other wrongdoing with regard to the original damage or loss to the collateral. Accordingly, we hold that the guarantors have not proven as a matter of law that they have no liability to Lexington under the doctrines of subrogation and/or assignment.

### ORDER OF DISMISSAL

■ After the Bank received payment from Lexington, it filed a motion to dismiss its claims against Lexington and Gray. The Bank's motion stated in part that the payment by Lexington had "fully discharged the liability of any party, including Defendant Ted G. Gray, Jr. and Defendant Lexington Insurance Company, to Plaintiff InterFirst Bank Austin, N.A." The guarantors now seize on that language to for-

mulate an argument that since the Bank has admitted that its debt was "discharged," and since Lexington did not object to the Bank's dismissal on that basis, any liability of the guarantors must also have been discharged.

Lexington made payment on February 15, 1985. The Bank assigned the note and deed of trust to Lexington on the same day. The Bank filed its motion to dismiss on February 27, 1985. After receiving payment for the note, and after assigning away all of its rights thereunder, the Bank would normally have no remaining authority to release the guarantors from liability on the note. The summary judgment evidence contains no indication to the contrary. Accordingly, there is, at the very least, a material fact issue whether the Bank had the power to declare the note "discharged" and release the guarantors.

### COLLATERAL ESTOPPEL

Finally, the guarantors contend that their liability is precluded by collateral estoppel growing out of the judgment entered by the United States District Court for the Eastern District of Missouri in the suit between Lexington and Mississippi Lofts, and also by the compulsory counterclaim rule regarding the same suit.

The record before us does not contain any of the pleadings from the Missouri federal court case. However, from the opinions of the district court and court of appeals, it appears that Mississippi Lofts initially sued Lexington seeking a recovery under the policy. After paying the Bank, Lexington counterclaimed seeking "damages from Mississippi Lofts to compensate it for a payment it made to InterFirst Bank of Austin, Texas, under a standard mortgage clause." 653 F.Supp. at 346. The court denied Lexington's claim for damages, with the following explanation:

The company [Lexington] can potentially foreclose on the property under applicable state law and, in effect, recoup its payment to the bank. The insurance company is not entitled to a money judgment from the plaintiff in the amount it paid to Interfirst Bank *in addition to the rights it received from the bank under the assignment....* Since the defendant in its counterclaim seeks only a damage award, and not a declaration that the assignment of the deed of trust by Interfirst was valid, the Court must enter judgment against defendant.

653 F.Supp. at 347 (emphasis added).

The guarantors argue initially that the collateral estoppel doctrine precludes Lexington from asserting any claims against them in this suit. The gist of that argument is that, in ruling against Lexington on its claim for damages against Mississippi Lofts, the Missouri federal court necessarily found that Mississippi Lofts has no liability on the note; and that since Lexington has no claim against Mississippi Lofts, it has no claim against the guarantors. We disagree. The language used by the federal court is consistent with a holding that Lexington has no right of *subrogation* above and beyond whatever rights it had under the assignment, but that the assignment was valid and enforceable. Such a holding would be in accordance with the rule established in some jurisdictions that an insurer that pays a mortgagee pursuant to a standard mortgage clause may pursue its rights as *subrogee* of the mortgagee or as *assignee* of the mortgagee, but may not do both. *See, e.g., Wilson v. Home Owners Mutual Insurance Co.,* 148 Mich.App. 485, 384 N.W.2d 807 (1986); *Payne v. Buffalo Reinsurance Co.,* 69 N.C.App. 551, 317 S.E.2d 408 (1984). Having none of the pleadings from the Missouri federal court, we have no way of knowing what theory of damages was pursued by Lexington in that court. We do know, however, that in the instant case Lexington is seeking a recovery from the guarantors strictly on the basis of the assignment. We are unable, under the present state of the record, to conclude that a collateral estoppel defense has been established as a matter of law.

The guarantors' compulsory counterclaim theory is that their potential liability to Lexington is dependent on and derivative of the liability of Mississippi Lofts; that any claim by Lexington that Mississip-

pi Lofts was liable to Lexington on the note was a compulsory counterclaim in the Missouri federal court case; that, having failed to assert that alleged compulsory counterclaim in that court, Lexington's claim is now barred by Rule 13(a) of the Federal Rules of Civil Procedure; and that because Lexington has no claim against Mississippi Lofts, it has no claim against the guarantors. The guarantors did not raise, in any of their pleadings in the trial court, Rule 13(a), Fed.R.Civ.P., res judicata, or Rule 97, Tex.R.Civ.P., as a bar to Lexington's claim, and those defenses cannot be raised for the first time on appeal. *See* Tex.R.Civ.P. 94.

In addition, the guaranty agreements signed by the guarantors were unconditional "guaranties of payment"; accordingly, the guarantors were primarily liable and waived any requirement that the holder of the note take action against the maker as a condition precedent to their liability on the guaranties. *Hopkins v. First National Bank*, 551 S.W.2d 343, 345 (Tex.1977). Indeed, it is settled law in Texas that an unconditional guarantor may be liable for payment even though the holder of the note cannot enforce the claim against the maker of the note. *See Beddall v. Reader's Wholesale Distributors, Inc.*, 408 S.W.2d 237 (Tex.Civ.App.1966, no writ); *United States v. Little Joe Trawlers, Inc.*, 776 F.2d 1249 (5th Cir.1985).

For the reasons stated, we conclude that the summary judgment evidence did not show that the guarantors were entitled to judgment as a matter of law. The judgment of the trial court is reversed and the cause is remanded to that court for further proceedings.

POWERS, J., not participating.