Esparza 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-94-00730-CV







Jesus Esparza and Brenda Esparza/Scott and White Health Plan, Appellants



v.



Scott and White Health Plan/Jesus Esparza and Brenda Esparza, Appellees








FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT


NO. 142,520-B, HONORABLE RICK MORRIS, JUDGE PRESIDING








 This case presents the question of whether a contractual agreement providing for
a right of subrogation completely removes the issue of subrogation from the realm of equity. 

 Brenda and Jesus Esparza (the "Esparzas") settled a medical malpractice claim with
Dr. Larry Orrick and King's Daughters Clinic (collectively "Dr. Orrick") for injuries sustained
by their son, Zachary. Scott & White Health Plan ("Scott & White") intervened in the Esparzas'
suit against Dr. Orrick, seeking recovery of $264,625 plus attorney's fees from the Esparzas for
expenses Scott & White had incurred for Zachary's medical treatment. After a bench trial, the
district court rendered judgment in favor of Scott & White, awarding it $132,312 (one-half of the
amount sought) and attorney's fees of $1500. Both the Esparzas and Scott & White appeal. We
will affirm the trial court's judgment.

 


BACKGROUND


 The facts of this case are largely undisputed. Zachary Esparza sustained severe
injuries during birth that ultimately caused his death. Zachary's numerous health problems
included severe brain damage and seizures. During the twenty-two months of his life, he was
hospitalized more than twenty times. 

 The Esparzas sued Dr. Orrick in connection with these injuries and ultimately
negotiated a settlement of $1.6 million. The Esparzas were members of a health care plan
administered by Scott & White. Scott & White had paid $264,625 in medical bills for the benefit
of the Esparzas before their settlement with Dr. Orrick. After the settlement between Dr. Orrick
and the Esparzas was finalized, Scott & White filed a plea in intervention on May 23, 1994,
seeking subrogation for this amount plus attorney's fees. On July 8, 1994, the Esparzas amended
their petition to eliminate their claim against Dr. Orrick for past medical expenses.

 The Esparzas contested Scott & White's subrogation claim and introduced
testimony that the $1.6 million, exclusive of medical costs, did not make them whole and that
their understanding had always been that the $1.6 million did not include their past medical
expenses. They stated that they chose to settle for only $1.6 million (despite Dr. Orrick's policy
limit of $2 million) to avoid the risks of trial and because they wanted the money to directly
benefit Zachary, whose life expectancy was short due to his precarious medical condition. Mary
Black-Pearson, attorney ad litem appointed by the court, testified that she approved the $1.6
million settlement for the same reasons. The settlement agreement was apparently reached
sometime before May 23, 1994, but was not finally approved until the trial court rendered its final
judgment on the subrogation issue on October 17, 1994. Zachary Esparza died on June 10, 1994. 


 The Esparzas argued in the alternative that if Scott & White were awarded recovery
in subrogation, forty percent should be deducted from the award for attorney's fees because Scott
& White did not participate in the suit that led to the collection of the $1.6 million settlement. 
The parties stipulated that--if awarded at all--attorney's fees of forty percent for the Esparzas'
attorney's work on the case and $1500 for Scott & White's attorney's fees in the subrogation
claim were reasonable. 

 On October 17, 1994, the trial court rendered a final judgment for Scott & White
in the amount of $132,312 plus $1500 in attorney's fees and dismissed all of the original
defendants from the case. The Esparzas requested findings of fact and conclusions of law, which
the trial court filed on October 24, 1994. The Esparzas appeal the judgment in favor of Scott &
White in three points of error, claiming that the district court erred by: (1) granting Scott & White
a subrogation interest in the Esparzas' malpractice settlement, (2) awarding Scott & White
attorney's fees, and (3) denying the Esparzas an offset for attorney's fees from the amount
awarded to Scott & White. Scott & White cross appeals, alleging that the trial court erred in
awarding it only half of the amount that it claimed. 



DISCUSSION


 Relying on Ortiz v. Great Southern Fire and Casualty Insurance Co., 597 S.W.2d
342, 343 (Tex. 1980), the Esparzas argue in their first two points of error that the principles of
equitable subrogation govern this dispute and that under those principles Scott & White is not entitled to any subrogation recovery or to attorney's fees. Citing this Court's decision in
Lexington Insurance Co. v. Gray, 775 S.W.2d 679 (Tex. App.--Austin 1989, writ denied), Scott
& White counters that the principles of equitable subrogation do not apply in this case because an
express agreement in the Esparzas' insurance contract recognized Scott & White's right of
subrogation. (1) In arguing that equitable principles do not apply, Scott & White relies on our pronouncement in Lexington that "Texas courts . . . have given more substance to the distinction
[between "legal" and "conventional" subrogation than do most other courts], generally allowing
a subrogee claiming . . . under conventional subrogation to recover without regard to the relative
equities of the parties." (2) Id. at 683. "Legal subrogation" is governed by equity, while
"conventional subrogation" is governed by contractual agreement. Id. Scott & White insists that
because its contract with the Esparzas controls the right to subrogation, it is entitled to
indemnification for the full $264,625 out of the first monies the Esparzas recovered in their
settlement. We disagree. 

 The distinction we drew between legal and conventional subrogation in Lexington
simply means that under conventional subrogation no balancing of equities is necessary to
determine whether the subrogee has a right to recover at all. While an insurance contract
providing expressly for subrogation may remove from the realm of equity the question of whether
the insurer has a right to subrogation, it cannot answer the question of when the insurer is actually
entitled to subrogation or how much it should receive. See Duval County Ranch Co. v. Alamo
Lumber Co., 663 S.W.2d 627, 637 (Tex. App.--Amarillo 1983, writ ref'd n.r.e.); see also Shelter
Ins. Co. v. Frohlich, 498 N.W.2d 74, 79 (Neb. 1993). The principal purpose of an insurance
contract is to protect the insured from loss, thereby placing the risk of loss on the insurer. Ortiz,
597 S.W.2d at 344. The insurer has accepted payments from the insured to assume this risk of
loss. Therefore, if "`either the insurer or the insured must to some extent go unpaid, the loss
should be borne by the insurer for that is a risk the insured has paid it to assume.'" Id. (quoting
Garrity v. Rural Mut. Ins. Co., 253 N.W.2d 512, 514 (Wis. 1977)). This basic principle cannot
be summarily overcome by a boiler-plate provision in an insurance contract that purports to entitle
the insurer to subrogation out of the first monies received by the insured. To find otherwise
would be to defeat the fundamental contractual expectations of the average insured. Oss v. United
Servs. Auto. Ass'n, 807 F.2d 457, 460 (5th Cir. 1987). This is especially true in the context of
group health insurance contracts where the insured has little, if any, input regarding the content
of the contract. Accordingly, we reject Scott & White's argument that it is entitled to full
indemnification under the contract and overrule its cross-point of error.

 Historically, the right to subrogation is firmly grounded in and is not easily
detached from equitable principles. See generally 73 Am. Jur. 2d Subrogation §§ 1, 5, 6 (1974). 
Contracts that give insurers the right to subrogation "confirm, but [do] not expand, the equitable
subrogation rights of insurers." Oss, 807 F.2d at 460; see also Frohlich, 498 N.W.2d at 79
(quoting Oss, 807 F.2d at 460). To avoid injustice, the equities must still be balanced in deciding
what amount, if any, the subrogee is entitled to receive in a given case. A trial court's balancing
of the equities should not be disturbed on appeal unless a showing is made that it would be
inequitable to allow the judgment to stand. See Kneip v. Unitedbank-Victoria, 734 S.W.2d 130,
133 (Tex. App.--Corpus Christi 1987, no writ); Davis v. Carothers, 335 S.W.2d 631, 641 (Tex.
Civ. App.--Waco 1960, writ dism'd by agr.).

 A trial court is not cast adrift on the sea of equity without guidance, however. 
Various rules and considerations offer moorings for the trial court in applying equity and for us
in reviewing that court's decision. For example, one premise of the right of subrogation is to
prevent double recovery by the insured. Ortiz, 597 S.W.2d at 343. The general rule governing
equitable subrogation in this state and in most others is that an insurer is not entitled to
subrogation if the loss suffered by the insured is greater than the combined amount recovered from
the insurer and the tortfeasor. Id.; see also Frohlich, 498 N.W.2d at 80-81. In other words, the
insurer's right of subrogation may not be exercised until the insured has been made whole. Ortiz,
597 S.W.2d at 343. In its findings of fact, the trial court found that the Esparzas were not made
whole by their settlement of $1.6 million. The Esparzas contend that this finding and the "made
whole" doctrine preclude Scott & White's subrogation recovery.

 Although it is entitled to great weight, this rule of equitable subrogation is not
absolute, and must be considered within the factual context of the parties' dispute. Here, the
Esparzas acted without regard for the subrogation rights of Scott & White by settling with Dr.
Orrick for less than his insurance policy limits, releasing him from all claims, and nonsuiting their
claim for past medical expenses. This Court will not condone a party's acting to wholly
compromise the rights of a subrogee and then hiding disingenuously behind the "made whole"
doctrine. Cf. Oss, 807 F.2d at 460 (finding that an insured who settled for policy limits of
judgment-proof tortfeasor's insurance policy did not prejudice rights of insurer). On the other
hand, Scott & White failed to actively protect its own interests by waiting to intervene until the
Esparzas and Dr. Orrick had already reached a settlement. An insured party seeking
compensation for a grievous injury should not be put in the position of having to look out for the
competing interests of others.

 The dialectic between the majority and dissenting opinions in a Wisconsin Supreme
Court case highlights the difficulty in applying bright-line rules in the context of equity. See
Rimes v. State Farm Mut. Auto. Ins. Co., 316 N.W.2d 348 (Wis. 1982). In Rimes, a subrogated
insurer, State Farm, sought to recover payments it had made after its insured, Rimes, settled with
the tortfeasors and their liability insurers for an amount less than the tortfeasors' policy limits. 
Id. at 351. Subsequently, a trial was held to determine Rimes's damages, which the court found
to exceed $300,000--far more than the combined total of his $125,000 settlement recovery and
$9,600 in payments received from State Farm. Id. at 352.

 The majority concluded that State Farm was not entitled to subrogation under
Wisconsin law because "one who claims subrogation rights, whether under the aegis of either
legal or conventional subrogation, is barred from any recovery unless the insured is made whole." 
Id. at 353. In contrast, the dissent argued that Rimes impliedly agreed by accepting settlement
of his claim that he was made whole, especially because he settled for less than the total amount
of coverage available under the tortfeasors' insurance policies. Id. at 357-58 (Coffey, J.,
dissenting). The dissent further noted that an insured lacks incentive to pursue the rights of a
subrogated insurer if the "made whole" doctrine is applied rigidly, and that knowledgeable
plaintiff's counsel will view medical payments as a cushion or offset when negotiating the
settlement value of a case. Id. at 357-59.

 The majority and minority positions in Rimes underscore the conflict of interests
in subrogation which cannot be resolved by a bright-line test that curtails a trial court's discretion
to apply equity based on the facts of the case. An insurer's right of subrogation is derivative of
the injured party's claim and should not be considered until that party is adequately compensated;
however, the injured party may not impair with impunity the interests of one it has contractually
agreed to protect. As we noted in Lexington, subrogation has been accorded "hospitable"
treatment in Texas. 775 S.W.2d at 684. Accordingly, we hesitate to adopt--nor do we believe
Ortiz mandates--a rule that abrogates a trial court's weighing of factors such as the existence of a
written subrogation agreement, the parties' conduct during settlement and before the court, and
evidence of damages in determining the equities. Equity is inextricably tied to facts. In the
instant cause, it appears that the trial court balanced the equities of both parties and found that the
proper division of the medical expenses was half to each. Because the trial court could have
concluded that neither party was without fault in this case, we hold that the trial court's decision
did not lead to an inequitable result. We overrule the Esparzas' first point of error.

 The Esparzas also claim that Scott & White was not entitled to attorney's fees of
$1500. Because we hold that the trial court's award of subrogation was equitable, the award of
the stipulated attorney's fees was also proper. We overrule the Esparzas' second point of error. 

 In their third point of error, the Esparzas argue that the trial court erred in refusing
to award them an offset of attorney's fees or costs out of Scott & White's subrogation interest. 
While this assertion might be convincing if Scott & White had been awarded the entire $264,625
that it sought, it is not persuasive here because the trial judge apparently considered the Esparzas'
right to reimbursement for costs and attorney's fees in balancing the equities and determining the
amount of Scott & White's award. In its conclusions of law, the trial court stated specifically that
the Esparzas were not entitled to attorney's fees out of the $132,312 awarded to Scott & White. 
The law in this state requires an insurer who does not aid in the collection of damages from a third
party to pay its share of the attorney's fees and costs incurred by its insured. Ortiz, 597 S.W.2d
at 344. We presume that the trial judge properly applied the law in determining the award in this
case, and we understand his conclusion of law to mean that the Esparzas are not entitled to any
further offset out of the money awarded to Scott & White. Accordingly, we overrule the
Esparzas' third point of error and affirm the judgment of the trial court.


 

 Bea Ann Smith, Justice

Before Justices Powers, Kidd and B. A. Smith

Affirmed

Filed: July 12, 1995

Publish
1.   The insurance contract between the Esparzas and Scott & White states in part:


12.2 Subrogation


 * * * *


12.2.2 Health Plan shall have the right to proceed in the name of the
Member, with or without his or her consent, to secure right of
recovery of its costs, expenses, or the value of services rendered. 
The value of services rendered which Health Plan is entitled to
recover shall be the greater of (1) an amount equal to the usual and
customary charges for such services to the provider's customers
who pay cash, or (2) the amount which Health Plan was charged
for services rendered. Health Plan is entitled to discharge
subrogation rights on a prorata basis with any other contractual or
statutory subrogation holder. Furthermore, Health Plan is entitled
to deem the first amounts received by a Member as recoupment of
its costs, expenses, or the value of services rendered to which
Health Plan is entitled to subrogate up to the value of Health
Plan's claims.


12.2.3 Member shall cooperate fully in the exercise of these rights of
subrogation and shall take no action or refuse to take any action
which would prejudice the rights of Health Plan. No Member may
settle, compromise or release a claim against a third party unless
(1) the rights of Health Plan are expressly reserved in the
settlement, compromise or release and Health Plan is advised in
writing by Member within such period of time as is reasonably
necessary to protect Health Plan's rights, (2) Health Plan is paid in
full, or (3) Health Plan has given a representation, including legal
representation, in pursuit of its subrogation rights herein and
Member shall distribute to Health Plan any subrogation without
offset for attorney's fees or other costs of representation.


(Emphasis added.) 
2.   We note that Lexington involved an assignment of interest as opposed to subrogation.