# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00057-CV

**Texas Health Insurance Risk Pool, Appellant**

**v.**

**Sharon B. Sigmundik, Benjamin J. Sigmundik, Zachary P. Sigmundik, as the Sole and Legal Heirs and Beneficiaries of Thomas M. Sigmundik, Deceased and/or the Estate of Thomas M. Sigmundik, Deceased; Otto L. Monecke; and Virgina L. Monecke, Appellees**

### FROM THE DISTRICT COURT OF FAYETTE COUNTY, 155TH JUDICIAL DISTRICT NO. 2002V-159, HONORABLE DAN R. BECK, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

The Texas Health Insurance Risk Pool ("the Risk Pool") appeals from the trial court's judgment that the Risk Pool take nothing on its health insurance subrogation claim against Sharon, Benjamin, and Zachary Sigmundik, as the sole heirs and beneficiaries of Thomas Sigmundik, and the estate of Thomas Sigmundik (collectively, "the Sigmundiks"), and Otto and Virginia Monecke. The Risk Pool brought its subrogation claim in a petition for intervention in a wrongful death and survival action brought by the Sigmundiks against the Moneckes. The Sigmundiks ultimately settled with the Moneckes for $800,000 and the Risk Pool asserted a subrogation interest in the settlement proceeds. After a bench trial on the subrogation claim and a hearing on the allocation of the settlement proceeds, the trial court issued a final judgment ruling that the Risk Pool take nothing. We affirm the trial court's judgment.

## BACKGROUND

The underlying dispute arose from an oil field explosion that occurred on September 20, 2001. At the time of the incident, Otto Monecke was performing perforation services on a plugged oil well operated by Sigmundik. At some point during the perforation process, while both Monecke and Sigmundik were standing in the vicinity of the well, an explosive device unexpectedly detonated inside the well, causing an explosion that severely injured both men. Because Sigmundik was standing over the oil well at the time of the accident, he sustained extensive injuries from shrapnel that was propelled out of the well during the explosion, as well as second-degree burns over 61% of his body and third-degree burns over 10% of his body. Sigmundik survived for 52 days at Brooke Army Medical Center, undergoing numerous surgeries before ultimately dying from his injuries. The Risk Pool paid all of Sigmundik's medical expenses resulting from the accident, a sum of $336,874.71.[1]

On June 18, 2002, Otto Monecke and his wife, Virginia Monecke, brought suit against the Sigmundiks, alleging that Thomas Sigmundik negligently caused the explosion. The Sigmundiks then counterclaimed, alleging that Otto Monecke negligently caused the explosion. On September 30, 2002, the Risk Pool filed a petition in intervention, asserting a subrogation interest against any settlement proceeds paid to the estate of Thomas Sigmundik, based on a subrogation provision in the health insurance policy covering Thomas Sigmundik. In September 2004, almost

---

[1] The Risk Pool provides access to health insurance coverage to otherwise uninsurable Texans and their immediate families. *See* Tex. Ins. Code Ann. §§ 1506.101, .152 (West 2009). Sharon Sigmundik testified that the Sigmundik family obtained insurance from the Risk Pool as a result of her rheumatoid arthritis and resulting difficulty obtaining health insurance elsewhere.

three years after the accident, the parties participated in mediation. The Sigmundiks agreed to settle their counterclaim against the Moneckes for $800,000, and the Moneckes agreed to non-suit their claim against the Sigmundiks, subject to the court's approval.

In November 2004, the trial court held a bench trial on the Risk Pool's asserted subrogation interest and ruled that the Risk Pool take nothing because the Sigmundiks had not been made whole by the settlement amount.[2] In December 2004, the trial court held another hearing in which it approved the settlement and allocated the settlement sum among Sharon, Benjamin, and Zachary Sigmundik. The trial court then signed a judgment approving the settlement agreement and incorporating its previous order ruling that the Risk Pool take nothing on its subrogation claim. The Risk Pool appeals from the trial court's judgment.

## DISCUSSION

In its first point of error, the Risk Pool argues that it was improperly deprived of a trial on the merits of its subrogation claim against the Moneckes and that the trial court erred by issuing a final judgment before allowing the Risk Pool to litigate the negligence claim. In support of this argument, the Risk Pool cites the rule that an insurance company's subrogation claim cannot be destroyed by a settlement and release of liability between the third-party tortfeasor and the insured if the third-party tortfeasor is aware of the subrogation claim. *See Wichita City Lines v. Puckett*, 295 S.W.2d 894, 899-900 (Tex. 1956); *Landsdowne-Moody v. St. Clair*, 613 S.W.2d 792, 793 (Tex. Civ. App.—Houston [14th Dist.] 1981, no writ). However, this argument was not properly

---

[2] At the bench trial, the parties presented extensive documentary evidence and called a number of witnesses, including the executive director of the Risk Pool, Sharon Sigmundik and her two minor sons, and the parties' counsel. The court also heard argument from the children's guardian ad litem.

preserved for appeal and is therefore waived.

The trial court, in its findings of fact and conclusions of law, found that the Risk Pool's "subrogation claims were heard by bench trial in the absence of any jury trial request or other objection to the proceeding." This finding of fact is supported by the transcript of the bench trial, which reflects that the Risk Pool presented argument and evidence in support of its subrogation interest in the settlement proceeds without indicating any intention to alternatively pursue its subrogation claim against the Moneckes directly through litigation on the merits of the negligence claim.[3] In addition, the trial court's final judgment, signed after the December 2004 settlement hearing, expressly states that the Risk Pool "is entitled to take nothing of and from Defendants/Counter-Plaintiffs and from Counter-Defendants," referring to both the Sigmundiks and the Moneckes, and that "[t]his judgment is final, disposes of all claims and parties, and is appealable." After the final judgment was issued, the Risk Pool did not file a motion for new trial or otherwise assert that it sought a trial on the merits of its subrogation claim against the Moneckes. While the Risk Pool argues on appeal that it preserved the issue by requesting findings of fact relevant to a negligence claim against the Moneckes, our review reveals that the findings of fact requested by the Risk Pool pertain to the issue of whether settlement proceeds should have been allocated to the estate of Thomas Sigmundik, rather than a potential negligence claim

---

[3] The notice of setting sent by the Sigmundiks' counsel to all parties stated, "This letter will confirm that a bench trial on the [Risk Pool's] subrogation claim has been set for November 18, 2004 at 9:00 a.m. at the Auxiliary Courthouse . . . ." There is nothing in the record to indicate that the Risk Pool objected to the setting or requested a bifurcated trial.

4

against the Moneckes.[4]

Because the Risk Pool failed to present any complaint to the trial court regarding its claim that it was entitled to a trial on the merits against the Moneckes before a final judgment could be issued, we hold that this argument was not preserved for appellate review. *See* Tex. R. App. P. 33.1 (record must reflect that complaint was made to trial court in order to be preserved for appellate review). The Risk Pool's first issue on appeal is overruled.

The Risk Pool's second, third, and fourth issues on appeal can be summarized as a single argument that the trial court erred in ruling that the Risk Pool take nothing on its subrogation

---

[4] The findings requested by the Risk Pool are as follows:

43.  Tom Sigmundik suffered damages in excess of $1 million.

44.  The estate of Tom Sigmundik suffered damages in excess of $1 million.

45.  Tom Sigmundik was conscious for approximately one hour immediately following the explosion and remained in a state of semi-consciousness much of the time until his death 52 days later.

46.  Tom Sigmundik knew that he was horribly injured.

47.  Tom Sigmundik knew that he was likely to die of his injuries.

48.  Tom Sigmundik knew that he would probably not see his children again.

49.  Tom Sigmundik experienced unimaginably great physical pain from the time of the explosion until his death at Brooke Army Burn Unit 52 days later.

50.  Tom Sigmundik experienced unimaginably great mental anguish from the time of the explosion until the time of his death 52 days later.

The trial court declined to issue the requested findings.

5

claim to a portion of the settlement proceeds.[5] The parties' briefs focus primarily on the equitable

subrogation principles described in *Esparza v. Scott & White Health Plan*, 909 S.W.2d 548, 551-53

(Tex. App.—Austin 1995, writ denied), particularly the "made whole" doctrine. Under the "made

whole" doctrine, an insurer is not entitled to an equitable right of subrogation until the insured is

"made whole," or fully compensated, for his loss. *See id.* at 552. However, the Texas Supreme

Court has since held that the "made whole" doctrine must yield to contractual subrogation provisions

when applicable. *See Fortis Benefits v. Cantu*, 234 S.W.3d 642, 649-50 (Tex. 2007).[6]

In the present case, Thomas Sigmundik's health insurance policy with the Risk Pool

included the following provision:

> **Subrogation:** We will be subrogated to all rights of recovery which any person may have against another party for all benefits paid by the Pool which were incurred by the Insured Person as a result of the negligence or misconduct of another party. Our right to repayment shall be a lien against any recovery by the Insured Person whether it be by judgment, settlement, or otherwise. The amount of any repayment will be no more than the total amount of benefits paid by Us. Reasonable attorney fees may be deducted if prior written approval is obtained from Us. The Insured Person agrees to give the Administrator all necessary information and complete all documents required by Us to assist the Administrator in the enforcement of Our right of subrogation.

It is undisputed that Thomas Sigmundik was the sole insured under his policy with

the Risk Pool. The Risk Pool concedes that it has a subrogation right only in the amount of the

---

[5] The Risk Pool's second issue on appeal presents the argument that the trial court erred in denying the Pool a share of the settlement proceeds, while its third and fourth issues challenge a number of findings of fact and conclusions of law that support the trial court's take-nothing judgment. These issues are combined into a single discussion in the Risk Pool's brief.

[6] *Fortis Benefits* was addressed in supplemental briefing by the parties.

proceeds allocated to the estate of Thomas Sigmundik, stating in its brief, "The Pool does not claim that it is entitled to the first dollar of the settlement, but it does claim to be entitled to the first dollar of any settlement sum *allocated to the estate*." (Emphasis in original.) The trial court's final judgment, however, does not allocate any amount of the settlement sum to the estate, thus precluding the Risk Pool from recovering on its subrogation claim.

The trial court approved an allocation of the entire settlement sum between Thomas Sigmundik's widow, Sharon Sigmundik, and his two minor sons, Benjamin and Zachary Sigmundik. On appeal, the Risk Pool argues that the trial court erred in failing to require that a portion of the settlement funds be allocated to the estate of Thomas Sigmundik.

The Risk Pool, as the insurer seeking subrogation, has the burden of establishing what settlement funds, if any, should be allocated to an entity against whom it could assert its subrogation interest. *Cf. Ortiz v. Great S. Fire & Cas. Ins. Co.*, 597 S.W.2d 342, 344 (Tex. 1980) (insurer bears burden of showing what amount, if any, of settlement funds was allocated to covered loss). In finding of fact number 21, the trial court found that "[n]o specific allocation of any portion of the $800,000.00 settlement proceeds was made to any Estate of Thomas Sigmundik *or timely requested by Intervenor*." (Emphasis added.) The Risk Pool raised the issue of allocation to the estate for the first time at the settlement hearing, stating, "[T]he estate is being allocated nothing, and we object to that." Despite this objection, the Risk Pool did not make any specific request that a particular amount be allocated to the estate or provide any evidence regarding the proper allocation of the settlement funds. While the Risk Pool requested certain findings of fact related to the damages suffered by Thomas Sigmundik before his death, *see supra* note 4, it did not request that any conclusions regarding allocation of the settlement funds be drawn from those facts or otherwise seek

7

to connect the requested findings to the issue of settlement allocation. Therefore, we hold that the Risk Pool failed to carry its burden of establishing that settlement funds should be allocated to the estate.

Furthermore, we review the trial court's determination of the proper allocation of settlement funds for an abuse of discretion. *See Garcia v. Elizondo*, No. 04-00-00077-CV, 2001 Tex. App. LEXIS 790, at \*5-6 (Tex. App.—San Antonio Feb. 7, 2001, no pet.) (not designated for publication) (trial court did not abuse its discretion in denying motion to allocate portion of settlement funds to estate of decedent). Thomas Sigmundik, who was 46 years old at the time of his death, died intestate, so that no estate was ever actually opened and no representative ever made an appearance on behalf of an estate of Thomas Sigmundik. The trial court heard extensive testimony regarding the mental anguish experienced by Sharon Sigmundik and her two sons, Zachary and Benjamin, ages 12 and 13, respectively, at the time of their father's death, as well as the financial concerns related to the loss of the family's primary breadwinner.[7] When asked why the entire settlement amount was allocated to herself and her two minor sons with no amount allocated to the estate, Sharon Sigmundik answered, "[I]f you compensate the two boys for their loss and me for my loss out of the amount that was available, there is nothing left for [the estate]." Under these circumstances, we cannot conclude that the trial court abused its discretion in approving the allocation of the settlement funds to Sharon, Benjamin, and Zachary Sigmundik, without allocating any amount to an estate of Thomas Sigmundik. As a result, there are no settlement funds subject to

---

[7] Sharon Sigmundik testified at length regarding the family-owned business, Market Street Energy, a small oil and gas operating company that Thomas Sigmundik had been running almost entirely on his own, and the detrimental impact on the business from the loss of Thomas's expertise.

the Risk Pool's subrogation interest, which the Risk Pool concedes is limited to the amount of any recovery by the estate of the insured. The Risk Pool's second, third, and fourth issues on appeal are overruled and the trial court's judgment is affirmed in its entirety.

## CONCLUSION

We affirm the trial court's judgment.

_____

Diane M. Henson, Justice

Before Justices Patterson, Puryear and Henson[8]

Affirmed

Filed: July 31, 2009

_____

[8] Because former Chief Justice Law was originally assigned to author this opinion, the panel was reassigned as of March 3, 2009.