United States Court of Appeals
Fifth Circuit

**F I L E D**

September 25, 2006

Charles R. Fulbruge III
Clerk

*In the United States Court of Appeals*
*For the Fifth Circuit*

---

No. 04-20895

---

ROYAL INSURANCE COMPANY OF AMERICA,

Plaintiff - Appellant,

v.

CALIBER ONE INDEMNITY CO.; HARTFORD UNDERWRITERS INSURANCE CO.,

Defendants - Appellees.

---

Appeal from the United States District Court
for the Southern District of Texas
No. 4:03-CV-00852

---

Before JONES, Chief Judge, and DEMOSS and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

An excess carrier sued two primary insurance carriers to recover $1,000,000 the excess carrier paid on behalf of the parties' common insured to settle wrongful death and survival claims arising out of the care of a nursing home resident. We hold that (1) the excess carrier was entitled to pursue a cause of action based on equitable subrogation, (2) there was an occurrence within each of the primary policies' definition of that term, (3) the excess carrier's policy period did not overlap with the first primary carrier's, and (4) the second, consecutive primary carrier was required to exhaust its $1,000,000 limits.

We affirm the summary judgment in favor of the first primary carrier, Hartford Underwriters Insurance Company, reverse the summary judgment in favor of the second primary carrier, Caliber One Indemnity Company, and remand this case to the district court for further proceedings.

**I**

Pietra Nieto Treviño was 83 years old when she was admitted on July 1, 1997 to Turner Geriatric Center, a nursing home operated by Methodist Retirement Communities. She was not ambulatory, was in fragile condition, and suffered from a number of illnesses and conditions including degenerative joint disease, Parkinson's Disease, and dementia. She remained at the nursing home for almost three years, except for brief hospitalizations, until she was hospitalized on April 10, 2000. She died eleven days later, on April 21, 2000, from a Stage IV pressure ulcer, overwhelming sepsis, and pneumonia.

Treviño's survivors brought a wrongful death and survival action in state court against MRC Edgewater (doing business as Turner Geriatric Center) and five nurses who attended Treviño at Turner. Methodist Retirement Communities maintained primary and excess insurance coverage for general and professional liability that covered Turner Geriatric Center and its employees. Hartford Underwriters Insurance Company provided primary coverage of up to $1,000,000 for each "medical incident" under a professional liability policy or "occurrence" under a general liability policy from April 1, 1997 to April 1, 1998. That policy was renewed for April 1, 1998 through April 1, 1999, and the limit of liability for that twelve-month period was also $1,000,000. Caliber One Indemnity Company provided the

2

same type of primary coverage for April 1, 1999 to July 1, 2000. Royal Insurance Company of America provided excess coverage for April 1, 1999 through July 1, 2000. While reserving their respective rights to deny coverage, Hartford and Caliber One agreed to share the cost of defending Methodist in the state court action brought by Treviño's survivors.

In the wrongful death and survival suit, Treviño's family offered to settle for $3,000,000, and Methodist sent a "*Stowers*"[1] demand letter to Hartford, Caliber One, and Royal requesting them to accept the offer. Correspondence from Methodist indicates that it thought it had only $1,000,000 in primary coverage, although Royal took the position that the policy limits of both the Hartford and Caliber One policies were available because there was more than one occurrence. After further negotiations, the Treviño family's suit was settled for $2,000,000. Caliber One contributed $800,000, Hartford contributed $200,000, and Royal contributed $1,000,000 under protest, asserting that it would attempt to recover that amount from the primary carriers.

Royal then sued Hartford and Caliber One in state court to recoup the $1,000,000 it had paid, and that suit was removed to federal district court on the basis of diversity jurisdiction. The parties consented to conduct all proceedings before a United States magistrate judge, including trial and entry of final judgment. They filed cross-motions for summary judgment, and the magistrate granted judgment in favor of the primary carriers. The magistrate concluded that under Texas law, which governs this action, an excess carrier

---

[1] *G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544 (Tex. Comm'n App. 1929, holding approved).

3

has an equitable subrogation claim against a primary insurer "only when it is predicated on the violation of a tort duty owed to the insured"[2] and that the only tort theory under which such an insured may proceed is negligence. The magistrate concluded that neither of the primary carriers had been negligent. The judge reasoned that because Methodist had indicated that it had only $1,000,000 in primary coverage when it demanded that its insurers settle, this was an admission by the insured that was binding on Royal. The primary insurers had done all that Methodist asked, the magistrate concluded. The magistrate further concluded that even if Royal could assert an equitable subrogation claim based on breach of the contractual duties the primary carriers owed to Methodist, there was only one occurrence or medical incident within the meaning of the primary insurance policies because Treviño's death stemmed from an ongoing course of care and treatment. Under such circumstances, the magistrate concluded, Texas law does not allow an insured to "stack" coverage. Rather, the highest limits under any one policy apply, even if the negligence spanned multiple policy periods, and Hartford and Caliber One therefore had tendered the full limits, $1,000,000. The magistrate also rejected Royal's contention that the general commercial liability policies applied. Royal has pursued this appeal.

## II

As an initial matter, we disagree with the magistrate's characterization of Texas law regarding the nature of an excess carrier's causes of action against a primary carrier. More

---

[2]Memorandum and Order, 11.

4

than thirty-five years ago, the Supreme Court of Texas recognized that a carrier had both a right of "'conventional subrogation, which arises from the express insurance contract,'" against another carrier, and that if there were no contractual rights "authoriz[ing] recovery of a pro rata share of the sum paid, . . . equitable subrogation does."[3]  In support of the proposition that there was a right of "conventional subrogation," that court quoted the Seventh Circuit, which had held in a suit by an excess carrier against the primary insurer that "'[t]his is an action governed by contractual subrogation in favor of an excess insurer against the primary insurer.'"[4]

The magistrate misconstrued statements in a subsequent Texas Supreme Court decision, *American Centennial Insurance Co. v. Canal Insurance Co.*, in which the question was whether an excess carrier had causes of action against a primary carrier and trial counsel for mishandling a claim.[5]  The Supreme Court of Texas held that the excess carrier had a remedy against both based on equitable subrogation.[6]  The issue was not whether an excess carrier had subrogation rights to recover amounts that a primary insurer should have paid under its policy terms and limits.  The Texas court had previously recognized such a right

---

[3]*Employers Cas. Co. v. Transp. Ins. Co.*, 444 S.W.2d 606, 608, 610 (Tex. 1969) (citations omitted) (quoting *Commercial Standard Ins. Co. v. Am. Employers Ins. Co.*, 209 F.2d 60, 65 (6th Cir. 1954)).

[4]*Id.* at 609 (quoting *Cont'l Cas. Co. v. Am. Fid. & Cas. Co.*, 275 F.2d 381, 385 (7th Cir. 1960) (holding that an excess carrier was entitled to recover amounts it had paid to settle the underlying suit against its insured from the primary insurer based on contractual subrogation)).

[5]843 S.W.2d 480, 481 (Tex. 1992).

[6]*Id.* at 483.

in *Employers Casualty Co. v. Transport Insurance Co.*, and *Canal* cited *Employers Casualty* for the proposition that "[e]quitable subrogation has already been recognized in Texas."[7] In *Canal*, the only question was whether rights beyond such contractually based rights and beyond the duty recognized in *Stowers* should be enforceable by excess carriers. The concurring opinion in *Canal*, joined by five members of that court and therefore constituting binding precedent, made clear that the court was holding that when a primary carrier "negligently investigat[ed], prepar[ed] to defend, tr[ied] or settl[ed] the third party action"[8] and the amount of the judgment or cost to settle was thereby increased, an excess carrier could recover the extra amounts it had to pay an insured as a result. The Texas court explained that in such an action for negligence, "an excess carrier may recover only the difference between what it was required to pay and what it would have paid but for the primary carrier's negligent handling of the action."[9] The concurring opinion stated that "I assume from its reliance on the *Stowers* and *Ranger County* cases, and would so hold, that the excess carriers' only cause of action is for negligence."[10] The context in which this statement appears should make clear that the court was emphasizing its conclusion that an excess carrier "is not entitled to damages in its own right, or statutory or punitive damages," and that an excess carrier could not proceed on theories of "breach of a duty of good faith

---

[7]*Id*. at 482 (citing *Employers Cas. Co.*, 444 S.W.2d at 610).

[8]*Id*. at 485 (Hecht, J., concurring).

[9]*Id*. (Hecht, J., concurring).

[10]*Id*. at 486 (Hecht, J., concurring).

6

and fair dealing, . . . violations of the Texas Deceptive Trade Practices–Consumer Protection Act," or "article 21.21 of the Texas Insurance Code," all of which provided extra-contractual remedies to insureds.[11] In saying that an excess carrier's "only cause of action is for negligence," the court was not saying that contractually based rights were foreclosed. The court was simply placing limits on the availability of *tort* and extra-contractual remedies.

It is well-recognized by the Supreme Court of Texas that when more than one policy covers an occurrence, "all insurers whose policies are triggered must allocate funding of the indemnity limit among themselves according to their subrogation rights."[12] A Texas court of appeals had no difficulty concluding that when an excess carrier sued to recover a primary carrier's policy limits after the excess carrier had paid an agreed judgment, the excess carrier had stated a cause of action for subrogation.[13] That court reasoned that "[s]ubrogation may be contractual (conventional) or equitable" and "the doctrine of subrogation is given a liberal application and is broad enough to include every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity and

---

[11]*Id*. at 485–86 (Hecht, J., concurring).

[12]*Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 855 (Tex. 1994); *see also CNA Lloyds of Texas v. St. Paul Ins. Co.*, 902 S.W.2d 657, 661 (Tex. App. - Austin 1995, writ dism'd by agr.) (holding that when continuous acts of malpractice resulted in one injury that triggered coverage under two insurance policies, one carrier "was entitled to equitable subrogation against" the other) (citing *Employers Cas. Co. v. Transp. Ins. Co.*, 444 S.W.2d at 609–10).

[13]*Argonaut Ins. Co. v. Allstate Ins. Co.*, 869 S.W.2d 537, 543 (Tex. App. - Corpus Christi 1993, writ denied).

good conscience should have been discharged by the latter."[14]  Under the doctrine of

equitable subrogation, "an excess insurer, paying a loss under a policy, 'stands in the shoes'

of its insured with regard to any cause of action its insured may have against a primary

insurer responsible for the loss."[15]  An insurer has a duty to indemnify an insured for losses

covered by the insurance policy.[16]

Caliber One and Hartford point to this circuit's decision applying Texas law in *St.*

*Paul Mercury Insurance Co. v. Lexington Insurance Co.*, in which two excess carriers

asserted, among other claims, that two primary carriers were "negligen[t] in the handling of

[the insured's] defense."[17]  This court made the unremarkable statement in this context that

an "equitable subrogation argument fails from the start if [the excess carriers] are unable to

establish [the insured] would have a cause of action against [the primary insurers] for

negligence."[18]  This court concluded that there was no evidence that "the defense provided

---

[14]*See id.* at 541-42.

[15]*Gen. Star Indem. Co. v. Vesta Fire Ins. Corp.*, 173 F.3d 946, 949 (5th Cir. 1999) (quoting *Westchester Fire Ins. v. Heddington Ins.*, 883 F. Supp. 158, 162 (S.D. Tex. 1995)); *see also Am. Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 482 (Tex. 1992) ("Under th[e] theory [of equitable subrogation], the insurer paying a loss under a policy becomes equitably subrogated to any cause of action the insured may have against a third party responsible for the loss.").

[16]*See, e.g.*, *Employers Cas. Co. v. Block*, 744 S.W.2d 940, 944 (Tex. 1988) (holding that an insured can recover for damages if it proves the damages are covered by the policy), *overruled on other grounds by State Farm Fire & Cas. Co. v. Gandy*, 925 S.W.2d 696, 714 (Tex. 1996); *Great Am. Lloyds Ins. Co. v. Mittlestadt*, 109 S.W.3d 784, 786 (Tex. App. - Fort Worth 2003, no pet.) (explaining that the duty to indemnify arises if "the underlying litigation establishes liability for damages covered by the insuring agreement of the policy") (emphasis omitted).

[17]78 F.3d 202, 208 (5th Cir. 1996).

[18]*Id.*

[by the primary carriers] gave rise to a negligence cause of action."[19]  Admittedly, there is language in that decision suggesting that all equitable subrogation claims must be based on negligence in the insurance context.[20]  Nevertheless, this court's actual holding was that, based on contractual provisions in the insurers' respective policies, the excess carriers were entitled to recover the primary carriers' full policy limits.[21]  This court did not discuss the nature of the cause of action that led to this result or the fact that Texas law has not recognized a direct cause of action by an excess carrier against a primary carrier, but instead, pins liability on subrogation.[22]

This circuit had previously examined Texas subrogation law in *Vesta Insurance Co. v. Amoco Production Co.* and concluded that "what Texas courts term 'conventional subrogation,' (subrogation that arises by contract) as distinguished from 'legal subrogation'

---

[19]*Id.* at 209.

[20]*See id.* at 208 n.21 (citing and quoting *Employers Nat'l Ins. Co. v. Gen. Accident Ins. Co.*, 857 F. Supp. 549, 552 (S.D. Tex. 1994) for the proposition "that before an excess carrier can recover under a theory of equitable subrogation, 'the excess carrier has to prove that the primary carrier was negligent in fulfilling its duties to the insured under the primary policy's terms'"); *id.* ("Thus, the fact that Centennial and St. Paul brokered a settlement within their combined policy limits supports our conclusion that [the excess carriers] may not rely on the theory of equitable subrogation.").

[21]*Id.* at 210.

[22]*See Am. Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 483 (Tex. 1992) ("[W]e hold that an excess carrier may bring an equitable subrogation action against the primary carrier. . . . [W]e decline at this time to permit a direct action."); *see also Employers Cas. Co. v. Transp. Ins. Co.*, 444 S.W.2d 606, 610 (Tex. 1969) ("[I]f the subrogation provision in its policy does not authorize recovery by [a primary insurer] from [another primary insurer] of a pro rata part of the sum paid as an attorney's fee in defense of [a suit against the insured], equitable subrogation does."); *cf. Gen. Star Indem. Co. v. Vesta Fire Ins. Corp.*, 173 F.3d 946, 950 (5th Cir. 1999) ("[W]e declined to extend directly to co-insurers the duty owed by an insurer to its insured under *Stowers*.") (citing *Foremost County Mut. Ins. Co. v. Home Indem. Co.*, 897 F.2d 754 (5th Cir. 1990)).

(subrogation that arises by operation of law) . . . is an equitable concept and thus is governed by the principles of equity."[23] This court concluded that the distinction between the two is that "Texas courts 'generally allow a subrogee claiming against a third party under conventional subrogation to recover without regard to the relative equities of the parties.'"[24] This court recognized that the right to subrogation based on contract rights is broader, not narrower, than equitable subrogation: "Texas law further recognizes that an underwriter is entitled to the benefits of subrogation as a matter of law (as distinguished from equity) even if its insured's right of recovery is contractual."[25]

In its motion for summary judgment, Royal characterized its claim against Hartford and Caliber One as one for equitable subrogation. Royal has maintained throughout the district court proceedings and this appeal that the primary carriers were required to exhaust their policy limits before Royal's excess policy was triggered based on a provision in Royal's policy with Methodist. Royal made plain that it was seeking subrogation under Texas law.[26] No allegation or proof of negligence was required.

The magistrate also erred in concluding that Royal could not pursue a claim against

---

[23]986 F.2d 981, 988 (5th Cir. 1993) (quoting *Lexington Ins. Co. v. Gray*, 775 S.W.2d 679, 683 (Tex. App. - Austin 1989, writ denied)).

[24]*Id.* (quoting *Lexington Ins. Co.*, 775 S.W.2d at 683).

[25]*Id.*

[26]*Cf. Gen. Star Indem. Co.*, 173 F.3d at 951 (rejecting a "hyper-technical reading" of pleadings asserting an equitable subrogation claim that had framed the breach of duty as one owed to a co-insurer rather than the insured).

the primary carriers because Methodist indicated in a letter that its primary insurance coverage under the Hartford and Caliber One policies was limited to $1,000,000, and Methodist never demanded that Hartford or Caliber One pay more than they did. The Supreme Court of Texas recognized equitable subrogation as a remedy for excess carriers precisely because an insured who has excess insurance coverage may not have any incentive to press its primary carrier for the full limits of its policy. In *Canal*, the Texas court said:

> *Stowers*[27] and *Ranger County*[28] imposed clear duties on the primary carrier to protect the interests of the insured. The primary carrier should not be relieved of these obligations simply because the insured has separately contracted for excess coverage. In this situation, where the insured has little incentive to enforce the primary carrier's duties, the excess carrier should be permitted to do so through equitable subrogation.[29]

An insured cannot reduce its primary policy limits to the detriment of its excess carrier any more than it can expand those limits. To allow Methodist to estop its excess carrier would give Methodist the unilateral right to determine when primary policy limits were exhausted within the meaning of its excess policy. The limits of the primary policies are questions to be determined by the policies themselves, not the insured, just as the question of whether

---

[27]*G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544 (Tex. Comm'n App. 1929, holding approved).

[28]*Ranger County Mut. Ins. Co. v. Guin*, 723 S.W.2d 656 (Tex. 1987).

[29]*Am. Centennial Ins. v. Canal Ins. Co.*, 843 S.W.2d 480, 483 (Tex. 1992); *see also Gen. Star Indem. Co.*, 173 F.3d at 950 n.18 ("In recognizing the availability of [equitable subrogation], the Texas Supreme Court reasoned that, if excess carriers were not subrogated to the claims of their insureds, primary insurers would have less incentive to settle within their policy limits and might be tempted to 'gamble' with excess carriers' money when potential judgments approach the primary insurers' limits.") (citing *Canal*, 843 S.W.2d at 483) (internal citations ommitted).

11

those limits have been exhausted is determined by the policies.

## III

The remaining issue is whether the primary coverage available to Methodist was $1,000,000, as Hartford and Caliber One contend, or $2,000,000 or $3,000,000 as Royal contends. The Hartford policy had a $1,000,000 limit for each year it was in effect, as did the Caliber One policy. The magistrate judge correctly concluded that under Texas law, there may be coverage under more than one policy "for a single claim involving indivisible injury,"[30] and in such circumstances, the Texas Supreme Court has held that "[i]f a single occurrence triggers more than one policy, covering different policy periods, . . . the insured's indemnity limit should be whatever limit applied at the single point in time during the coverage periods of the triggered policies when the insured's limit was highest."[31] This precludes "stacking" coverage under policies.[32] Conversely, if there were more than one occurrence and the injury were divisible, then the limits for each occurrence would be $1,000,000.[33]

Whether there was one occurrence or more is determined by the policies' respective terms. The magistrate held that the general commercial liability provisions in Hartford's and

---

[30]*Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 853 (Tex. 1994).

[31]*Id*. at 855.

[32]*Id*. at 853 ("The consecutive policies, covering distinct policy periods, could not be 'stacked' to multiply coverage for a singe claim involving indivisible injury.").

[33]*Id*. at 854 n.22 ("Policy language such as 'occurrence' or 'Per Claim Occurrence' generally measures policy deductibles or self-insured retentions as well as policy limits.").

Caliber One's policies are not implicated by the Treviño family's allegations, and Royal has failed to brief that issue in this court. Accordingly, we consider only the professional liability provisions.[34]

Hartford's policy, which was in effect from April 1, 1997 until April 1, 1999, stated in the "coverages" section:

> SECTION I – COVERAGES
> COVERAGE A.   BODILY INJURY AND PROPERTY DAMAGE LIABILITY
> 1.   Insuring Agreement.
>    a.   We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. . . .
>    b.   This insurance applies to "bodily injury" and "property damage" only if:
>    (1)   The "bodily injury" or "property damage" is caused by an "occurrence" . . . ; and
>    (2)   The "bodily injury" or "property damage" occurs during the policy period.
> 
> * * *
> 
> SECTION V – DEFINITIONS
> 
> * * *
> 
> 12.   "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

The professional liability form provided coverage for a "medical incident," which is defined as:

> any act or omission in the furnishing of professional health care services to any person, including:

---

[34] *See Dardar v. Lafourche Realty Co.*, 985 F.2d 824, 831 (5th Cir. 1993) ("Questions posed for appellate review but inadequately briefed are considered abandoned."); FED. R. APP. P. 28(a)(9)(A) (requiring argument to contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies").

(a)  the furnishing of food, beverages, medications or appliances in connection with such services;

* * *

Any such act or omission together with all related acts or omissions in the furnishing of such services shall be considered one "medical incident."

Caliber One's policy was in effect from April 1, 1999 through July 1, 2000.  In the general "COVERAGES" section that applies to both the commercial general liability and the professional liability insurance, the policy provides, "This insurance applies to 'bodily injury' . . . only if: (1) The 'bodily injury' . . . is caused by an 'occurrence' . . . ; and (2) The 'bodily injury' . . . occurs during the policy period."  "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  The section of the policy dealing more specifically with professional liability provides:

COVERAGE P.  PROFESSIONAL
1.  Insuring Agreement
A.  We will pay those sums that the insured becomes legally obligated to pay as "damages" because of any act, error or omission in the rendering or failure to render "professional services" by an insured or by any person for whose acts, errors or omissions an insured is legally responsible.

"Professional services" means nursing home services.  The declarations page reflects that the "Professional Each Claim Limit" is $1,000,000, and the section addressing policy limits says that "the Each Claim Limit is the most we will pay under Coverage P [professional liability] for the sum of 'damages' . . . arising out of any one claim" regardless of the number of insureds.

Royal's excess insurance policy was in effect from April 1, 1999 through July 1,

14

2000, and provides:

> I. Insuring Agreement
>> 1. We will pay on behalf of the Insured those sums in excess of the "Retained Limit" which the Insured becomes legally obligated to pay as damages to which this insurance applies because of:
>>> (a) "Bodily injury" . . . which occurs during the policy period and is caused by an "Occurrence";

Royal's policy defines "Retained Limit" as "the total of the applicable limits of the 'Underlying Insurance' shown on the declaration page plus the applicable limits of any other insurance collectible by the Insured." It defines "Occurrence" as "[a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions." Another pertinent provision provides:

> 9. Loss Payments
>> (a) We will have liability for any one "Occurrence" . . . only when the amount of the "Retained Limit" with respect to such "Occurrence" has been paid by:
>>> (i) the Insured;
>>> (ii) us on behalf of the Insured (other than under this policy); or
>>> (iii) the Insured's underlying insurer.

In the Treviño family's suit against Methodist and the five nurses employed at the nursing home, the live pleading at the time the case was settled focused on the last several months of Treviño's life and the injuries and conditions leading to her death, all of which occurred during Caliber One's policy period.[35] However, considerable discovery was

_____

[35]The Treviño plaintiffs' petition alleged:

> Because of her condition on admission [to the nursing home] and at all times thereafter, Mrs. Treviño was known to be at risk for problems such as dehydration,

15

conducted in that case, and several experts presented reports. At least one expert opined that Methodist employees were negligent at different times during the period the Hartford policy was in effect and that this negligence caused discrete, although relatively minor, injuries to Treviño. An expert concluded that the failure to clean Treviño properly and to apply appropriate medication led to rashes. Other breaches of the standard of care allegedly led to a urinary tract infection. The alleged failure to supervise Treviño and properly secure her in her wheelchair caused bruises on her hands. Treviño suffered severe stomach pain that was ignored and could have been avoided or relieved. Nurses massaged damaged tissue, which was allegedly contrary to the standard of care, and caused Treviño to suffer skin tearing and pain. These breaches of the standard of care and the resulting injuries are divisible from the alleged acts of negligence that occurred a year later that caused pneumonia, and a massive, infected Stage IV pressure sore and resulting sepsis, leading to Treviño's death. If Treviño's injuries prior to those she sustained in the months preceding her death had been more severe, such as a broken arm on one occasion and a skull fracture a few months later, we would have no difficulty in concluding that these discrete injuries and

<hr>

malnutrition and skin breakdown. Unfortunately, during the last several months of her stay at Turner Geriatric Center, the facility and its staff failed to take adequate measures to guard against these problems. Mrs. Treviño's health deteriorated to the point of requiring hospitalization on several occasions, including instances on October 1, 1999; November 2, 1999; and December 21, 1999, for treatment of problems such as urinary tract infections and severe dehydration.

Other allegations chronicled events that occurred from December 1999 through Treviño's death in April 2000, emphasizing the acts or omissions that allegedly led to the development of the Stage IV and other pressure sores, pneumonia, and a bacterial infection.

their causes were divisible from the acts or omission that later caused the Stage IV pressure sore and other ailments occurring more than a year later.[36] The fact that Treviño instead suffered rashes, bruises, pain, and infections in the year before she developed a severe pressure sore and other conditions does not alter the analysis.

We note that the Hartford policy does not treat the acts and omissions leading to discrete injuries to Treviño that occurred when its policy was in effect as separate occurrences. Hartford's policy provides that "any act or omission in the furnishing of professional health care services to any person . . . together with all related acts or omissions in the furnishing of such services shall be considered one 'medical incident.'"

Caliber One's policy provisions differ from Hartford's. Caliber One's policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," and Caliber One contends that the injuries Treviño sustained during its policy period were the result of "continuous or repeated exposure to substantially the same general harmful conditions" to which Treviño was exposed during Hartford's policy period. In another context, which was employees' sexual molestation of minors,[37] this circuit expressed its agreement with the Seventh Circuit's conclusion that

---

[36]*See H. E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 150 F.3d 526, 533 (5th Cir. 1998) (applying Texas law and holding that "multiple acts of sexual abuse . . . of the same child was one occurrence per policy period) (citing *Soc'y of the Roman Catholic Church of the Diocese of Lafayette and Lake Charles, Inc. v. Interstate Fire & Cas. Co.*, 26 F.3d 1359, 1365–66 (5th Cir. 1994) (applying Louisiana law and holding that "[w]hen the priest molested the same child during the succeeding policy year, again there was both bodily injury and an occurrence. Thus, each child suffered an 'occurrence' in each policy period in which he was molested.")).

[37]*H. E. Butt Grocery Co.*, 150 F.3d at 531.

17

"'continuous or repeated exposure to conditions' sounds like language designed to deal with asbestos fibers in the air, or lead-based paint on the walls, rather than with priests and choirboys."[38]  In the case before us, most if not all of the alleged negligence involved acts or omissions of caregivers, not the conditions of the nursing home's facilities or the ambient air.  The Supreme Court of Texas contrasted the typical "occurrence" language that includes "continuous or repeated exposure to substantially the same general conditions" with language tailored to fit circumstances health care providers face:

> The APIE policy language that defines the scope of "Each Claim Occurrence" to include "[a] series of acts or occurrences," is apparently intended to have a coverage effect similar to the "continuous or repeated exposure" unifying directive in commercial liability policies – but in a manner that is meaningful in the medical context.  For example, medical malpractice frequently involves an operation or an extended course of treatment.  A malpractice event may involve numerous independent grounds of negligence that cannot be unified as "repeated exposure to substantially the same conditions," but that nevertheless constitute "a series of acts or occurrences" that are related and form a single malpractice claim.[39]

The "numerous independent grounds of negligence" that were alleged to have occurred throughout Treviño's stay at the nursing home "cannot be unified as 'repeated exposure to substantially the same conditions.'"[40]  The acts and omissions that caused Treviño's Stage IV pressure sore, pneumonia, and other injuries that allegedly resulted in her death are divisible from the acts and omissions and Treviño's resulting injuries during

---

[38]*Lee v. Interstate Fire & Cas. Co.*, 86 F.3d 101, 104 (7th Cir. 1996).

[39]*Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 853–54 n.21 (Tex. 1994).

[40]*Id.*

18

Hartford's policy period.

Within Caliber One's policy period, however, its policy limit is nevertheless $1,000,000 for the various acts of negligence and the corresponding injuries because its insured, Methodist, had only one claim for indemnity for the damages Treviño's family sought. The Caliber One policy provided that "regardless of the number of . . . Insureds . . . the Each Claim Limit is the most we will pay under Coverage P [professional liability] for the sum of 'damages' . . . arising out of any one claim." The reference to "any one claim" is to a claim by the insured, not the number of the underlying claims against the insured.

The claims asserted in the Treviño family's lawsuit against Methodist were not "a single claim involving *indivisible injury*," and the rule set forth in the Supreme Court of Texas's decision in *American Physicians Insurance Exchange* prohibiting "stacking" does not apply.[41] This does not mean, however, that Royal is entitled to "stack" the limits in both primary policies before it is obligated to indemnify Methodist. Royal's policy period did not overlap with Hartford's. Coverage under the Hartford policy applied only to occurrences from April 1, 1997 through April 1, 1999. Hartford's policy did not apply to the acts and omissions that occurred after April 1, 1999. Royal's excess policy covered occurrences from April 1, 1999 through July 1, 2000. Royal's policy provided that the "retained limit" that must be paid before Royal's excess coverage became available was the "applicable limits of

---

[41]*Id*. at 853 (emphasis added).

any other insurance collectible by the insured." As we have seen, Hartford's limits were not applicable to acts or omissions occurring after April 1, 1999. Royal's express policy provisions do not permit Royal to look to Hartford for payment. This court has held that "[e]ach carrier is responsible, up to its occurrence limits, for all damages emanating from [occurrences] that occur during the insurer's policy period. All [occurrences] occurring outside a carrier's policy are covered by the insurer on the risk at the time of the [occurrence]."[42] This court recognized that such an "approach maximizes coverage for the insured and allocates the loss according to the policy language."[43]

* * * * *

Caliber One was required to exhaust its policy limits of $1,000,000 before Royal was obligated to indemnify Methodist. Accordingly, the magistrate erred in granting Caliber One's motion for summary judgment. We AFFIRM the summary judgment in favor of Hartford, REVERSE the summary judgment in favor of Caliber One, and REMAND this case to the district court for further proceedings.

---

[42]*Soc'y of the Roman Catholic Church of the Diocese of Lafayette and Lake Charles, Inc. v. Interstate Fire & Cas. Co.*, 26 F.3d 1359, 1366 (5th Cir. 1994).

[43]*Id.*