IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 22, 2008

Charles R. Fulbruge III
Clerk

No. 07-20488

NORTH AMERICAN SPECIALTY INSURANCE COMPANY, as successor in interest to Commercial Underwriters Insurance Company

Plaintiff - Appellant

v.

ROYAL SURPLUS LINES INSURANCE COMPANY; EVANSTON INSURANCE COMPANY

Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before SMITH, WIENER and HAYNES, Circuit Judges.

HAYNES, Circuit Judge:

This case involves a dispute between two primary insurers, Royal Surplus Lines Insurance Company ("Royal") and Evanston Insurance Company ("Evanston"), and an excess insurer, North American Specialty Insurance Company ("North American"),[1] and arises out of a tort suit against a nursing home. North American appeals the district court's grant of summary judgment in favor of Royal and Evanston. For the reasons set forth below, we AFFIRM.

---

[1] North American is a successor to Commercial Underwriters Insurance Company, under whose name the original suit was brought.

## I.  BACKGROUND

Velma Carr sued the Heritage Sam Houston Gardens nursing home, its parent company Heritage Housing, and a number of its employees in state court for "continuing negligence" in the nursing home's care of her husband, Raymond Carr.  Mr. Carr resided at the nursing home from February 1999 to June 2000, when he was transferred to another home.  He died in 2002.  The suit alleged that the nursing home's "pattern and practice of ongoing neglect" caused Mr. Carr to suffer from "a dislocated shoulder, pressure sores, skin tears and contusions, ulcers," and other "pain" and "indignity" resulting from failures of basic care.  At trial, a jury awarded over $4.5 million in actual and punitive damages.  Royal thereafter settled the case with Mrs. Carr on behalf of the individual nurse defendants and took the position that its coverage was thereby exhausted.[2]

The two corporate defendants appealed, with North American paying the costs of the appeal, and a state appellate court reversed the trial judgment against them.  Heritage Housing Dev., Inc. v. Carr, 199 S.W.3d 560, 572 (Tex. App.SSHouston [1st Dist.] 2006, no pet.).  It rendered judgment in favor of Heritage Housing and remanded for a new trial against the nursing home.[3]  Id.  Subsequently,  North American paid $1.625 million to settle with the Carrs on behalf of the nursing home before another trial was held.

Meanwhile, North American filed a lawsuit, which was removed to federal court, over liability coverage for damages and defense costs incurred by insureds

---

[2] Evanston took the position that, because the Royal policy afforded the most coverage, Royal should handle the defense with Evanston contributing to it.  At oral argument, Evanston stated that it has settled all claims with Royal regarding their respective obligations to each other.

[3] The remand was based upon the appellate court's determination that submission of Heritage Housing's negligence as part of the question asking the jury to calculate each party's percentage of responsibility led to an incorrect result.

in the underlying tort suit. During the period over which Mrs. Carr alleged negligence, the insureds had three successive, non-overlapping insurance policies providing primary liability coverage: a $1 million policy from Royal covering April 1998 to April 1999; a $1 million policy from Royal covering April 1999 to April 2000; and a $500,000 policy from Evanston covering April 2000 to April 2001. Concurrent with the primary policies, the insureds also had two policies providing excess coverage: a $5 million policy from North American covering April 1998 to April 1999 and a $5 million policy from North American covering April 1999 to April 2000. All of these policies were issued to the insureds with knowledge that the business being insured was a long-term health care facility. As Evanston noted, North American did not have an excess policy for the period covered by the Evanston policy. It is undisputed that, in combination, Evanston and Royal have paid more than $1 million in defense and indemnity costs for the Carr lawsuit. North American concedes that if only one policy amount and only one policy type is implicated by the Carr lawsuit, then Appellees owe nothing further.

In the coverage case, North American argued, inter alia, that Mrs. Carr had sued for discrete acts of negligence occurring over the course of the three primary policy periods such that the primary coverage limits should be "stacked." North American's excess coverage then would not be triggered until the limit of the total of all three primary policies ($2.5 million) has been reached. North American further argued that the stacking principle should apply to defense costs, in addition to indemnity coverage. Finally, North American argued that the defense costs incurred on behalf of the nursing home's parent company should be allocated to the Commercial General Liability ("CGL") part

of the primary insurance policies rather than the Hospital Professional Liability ("HPL") part.[4]

On October 29, 2004, the district court granted partial summary judgment to Royal and Evanston, holding that the policies could not be temporally "stacked" for purposes of indemnity payments and that defense costs could not be allocated to the CGL portion of the policy. Commercial Underwriters Ins. Co. v. Royal Surplus Lines Ins. Co., 345 F. Supp. 2d 652, 658 (S.D. Tex. 2004). Thereafter, the court granted further partial summary judgment to Royal and Evanston, holding that the policies could not be temporally "stacked" for defense cost allocation purposes. Ultimately, the court issued final summary judgment as to all parties and issues, and this appeal followed.

## II. STANDARD OF REVIEW

We review a grant of summary judgment de novo. Allstate Ins. Co. v. Disability Servs. of the Sw. Inc., 400 F.3d 260, 262-63 (5th Cir. 2005). Summary judgment is proper when the pleadings and evidence on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citations omitted).

## III. DISCUSSION

This case involves, in essence, two forms of stacking: (1) temporal, across policies covering different time periods; and (2) subject matter, across policies within a time period that cover different potential liabilities. Within the first category, North American seeks stacking of two different things – indemnity payments and defense costs.

### A. Equitable Subrogation

---

[4] Because the coverage limits applied separately to each part, a policy with a $1 million limit allowed $1 million of CGL coverage and $1 million of HPL coverage. Thus, North American's argument, if successful, would provide for more primary coverage before reaching its excess layer.

North American's lawsuit is based on its contention that it is entitled to equitable subrogation as an excess carrier against primary carriers. At the outset, then, the question arises whether North American can assert such a claim here. Evanston also challenges whether North American sought recovery on an equitable subrogation theory in the district court. Texas cases providing a right of equitable subrogation to an excess carrier involve an excess carrier suing a primary carrier, where their respective policies overlap temporally. See, e.g., Am. Centennial Ins. Co. v. Canal Ins. Co., 843 S.W.2d 480, 481 (Tex. 1992) (allowing equitable subrogation by an excess carrier to the insured's Stowers[5] claim against the primary carrier). That is not the case here as to Evanston. As a result, North American cannot "step into the shoes" of its insured as to a primary carrier to which North American is not excess.[6] Royal Ins. Co. v. Caliber One Indem. Co., 465 F.3d 614, 625 (5th Cir. 2006).[7] North American cannot recover against Evanston under a theory of equitable subrogation.[8] Because Evanston's arguments under the stacking theory are also correct, we discuss the Evanston policy along with the Royal policies in that analysis below.

This case potentially presents the issue of whether recent Texas cases have eroded the underpinnings of Canal even in cases of temporally overlapping excess and primary policies, such as those of North American and Royal. See

---

[5] G.A. Stowers Furniture Co. v. Am. Indem. Co., 15 S.W.2d 544 (Tex. Comm'n App. 1929, holding approved).

[6] Evanston also argues that North American never raised the principle of equitable subrogation in the trial court; North American concedes it did not "use the magic words" but argues that it adequately raised the concept below.

[7] We are puzzled by North American's contention at oral argument that this case was decided under Louisiana law. The opinion expressly states that it was decided under Texas law.

[8] Thus, we need not determine if North American properly raised this ground in the trial court.

Excess Underwriters at Lloyd's v. Frank's Casing Crew & Rental Tools, Inc., 246 S.W.3d 42, 48-50 (Tex. 2008) (holding that absent an express agreement to the contrary, a carrier who settles a claim later determined not to be covered by its policy cannot sue the insured for reimbursement of the excess amount); Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co., 236 S.W.3d 765, 768 (Tex. 2007) (holding that in the absence of an agreement with each other, a primary carrier for the same policy period as another primary carrier has no right of contribution against the other carrier even if it pays more than its pro rata share of the defense or indemnity costs). Mid-Continent distinguishes Canal as follows: "In Canal, we recognized equitable subrogation as a basis for an excess insurer's recovery against a primary insurer to prevent a primary insurer from taking advantage of an excess insurer, acting solely as such, when a potential judgment approaches the primary insurer's policy limits." 236 S.W.3d at 776 (citing Canal, 843 S.W.2d at 483). Canal involved an equitable subrogation claim based upon the insured's own Stowers claim against the primary carrier.

At oral argument, Royal's counsel conceded that the principles of equitable subrogation announced in Canal have not been abrogated by later decisions. Because we resolve this case on the stacking arguments, we need not decide the question of whether equitable subrogation applies to the Royal policies.

## B. Temporal Stacking

### 1. Indemnity

Thus, we turn to the stacking issues. "Stacking" refers to the concept of taking policy limits from multiple, but not overlapping, policies potentially covering the same lawsuit and adding those limits together. Am. Physicians Ins. Exch. v. Garcia, 876 S.W.2d 842, 854-55 (Tex. 1994). In Garcia, the Texas Supreme Court considered what coverage limit to apply when there are consecutive policies covering distinct policy periods and a claim occurrence extends throughout multiple policy periods. The court held that the coverage

6

limits "could not be 'stacked' to multiply coverage for a single claim involving indivisible injury" such that the coverage limit would be the "sum of the limits provided by the applicable policies."[9] Id. at 853-54. Instead, when "a single occurrence triggers more than one policy, covering different policy periods, . . . the insured's indemnity limit should be whatever limit applied at the single point in time during the coverage periods of the triggered policies when the insured's limit was highest." Id. at 855.

The parties in this case do not dispute the validity of Garcia's anti-stacking rule. Rather, they disagree about whether the liability arising from Mrs. Carr's suit involved a single covered event or multiple discrete covered events. Under Garcia's rule, if the negligence at the nursing home constituted a single covered event, it would trigger only one coverage limit. But if the negligence consisted of multiple, discrete covered events, each such event would trigger its own separate coverage limit.

In answering this question, we begin with the policy language. The Royal policies cover medical incidents and define a "medical incident" as "any act or omission: a. In the providing of or failure to provide professional health care services to your patients, including: (1) The providing or dispensing of food, beverages, medications or medical supplies or appliances in connection with such services; . . . ." They further state that "[a]ll related 'medical incidents' arising

---

[9] The court explained the rationale for this rule:

> [The argument for stacking] rests on the assumption that [the insured] had three times more insurance than he purchased. At no time during the four relevant coverage years did any two policies overlap. Thus, at no time during the four years did [the insured] carry liability insurance with a per-occurrence limit greater than $500,000. [The insured] did not purchase malpractice insurance for $1.5 million in coverage, as he might have done by purchasing excess or umbrella coverage, and therefore he may not claim to benefit from $1.5 million in coverage by stacking temporally distinct policies.

Garcia, 876 S.W.2d at 854-55.

out of the providing of or failure to provide professional health care services to any one person shall be considered one 'medical incident.'" The Evanston policy likewise provides that its Professional Liability coverage insures sums "the Insured shall become legally obligated to pay as damages because of malpractice arising out of the rendering of, or failure to render, . . . the following professional services in the Named Insured's . . . , nursing home . . . : medical . . . or nursing treatment to a patient, including the furnishing of food or beverages in connection therewith." It further states that "[t]wo or more claims arising out of a single act, error, omission or occurrence or a series of related acts, errors, omissions, or occurrence[s] shall be treated as a single claim."[10]

The key word in both of these policies is the same: "related." Under both policies, a series of multiple incidents becomes a single continuing incident or occurrence only if they are "related."[11] Although the policies do not further clarify the meaning of "related," a Texas appellate court has construed the term in a similar insurance contract to mean "having a logical or causal connection." Columbia Cas. Co. v. CP Nat'l, Inc., 175 S.W.3d 339, 347 (Tex. App.SSHouston [1st Dist.] 2004, pet. denied).

In this case, the district court considered summary judgment evidence consisting of the pleadings, trial transcript, and jury findings of the underlying suit, and concluded that the negligent acts at the nursing home were related.[12]

---

[10] As our court has previously held, "Whether there was one occurrence or more is determined by the policies' respective terms." Caliber One, 465 F.3d at 621.

[11] Under the Royal policy, the incidents must also relate to a single person. That requirement is not at issue here, as the incidents all related to Mr. Carr.

[12] North American argues that it was error for the district court to rely in part on the complaint and jury findings. There is no support for this assertion. To the contrary, in determining "the facts established in the underlying litigation," we "review the record from the underlying suit, which includes the pleadings, the trial transcript, the insurance policy, and the judgment." Great Am. Lloyds Ins. Co. v. Mittlestadt, 109 S.W.3d 784, 787 n.1 (Tex. App.SSFort Worth 2003, no pet.). In the related circumstance of apportioning a settlement

Mrs. Carr's complaint alleged "serious bodily injuries" which were "proximately caused by the continuing negligence" of the insureds. 345 F. Supp. 2d at 667-68. Elsewhere it referred to the nursing home's "continuing course of repeated negligence." Id. at 668. The court summarized:

> [T]he plaintiff's theory in the underlying suit, a theory upon which she prevailed, was that Mr. Carr was injured by a series of acts and omissions that were related, having both causal connections (i.e., the pattern of negligence was caused by management's focus on cutting costs) and logical connections (i.e., all of the relevant acts/omissions are logically connected to the concept of professional nursing home care, to which Mr. Carr was entitled).

Id.

Thus, while one could argue that each day the nursing home committed an act of negligence in failing to properly feed or treat Mr. Carr, these events are all "related." North American points out that Mr. Carr's problems began with poor nutritional care, followed by a shoulder injury, which led to mobility problems, which led to sores, skin ulcers and similar conditions. While North American contends these are discrete events, they all stemmed from a pattern of neglect and incompetence. Indeed, as noted above, the district court concluded that the Carrs' theory of the case in its complaint, continuing into its presentation of evidence at trial, was one of a continuing pattern of neglect, not a series of discrete events.[13] In this appeal, North American has not pointed to

---

between covered and uncovered claims, we have held that the trial court may look to all relevant evidence, whether or not it would have been admissible in the liability case. Am. Int'l Specialty Lines Ins. Co. v. Res-Care, Inc., 529 F.3d 649, 657-58 (5th Cir. 2008). We agree that the presence of a broad form submission to the jury of the negligence question is not dispositive on the question of whether there was a continuing pattern of neglect. Here the entire theory of the case – from pleadings through trial – was that of a continuing pattern of neglect, rather than a series of unrelated and disconnected wrongs.

[13] Although the jury verdict in the underlying liability case was ultimately vacated by the appellate court and remanded for a new trial as to the nursing home, both sides and the district court relied upon the evidence from the first trial. We conclude that it is appropriate to rely upon such evidence in assessing the question of the basis for the settlement. If North

any specific evidence showing discrete, unrelated injuries leading to discrete damages with individualized, unrelated damages. "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment. Nor is it our duty to do so on appeal." Stults v. Conoco, Inc., 76 F.3d 651, 657 (5th Cir. 1996) (citations omitted).

We conclude that Garcia applies to prevent North American from temporally stacking the policies for indemnity purposes. Under Garcia, the insured (and North American as its "equitable subrogee") is entitled to "whatever limit applied at the single point in time during the coverage periods of the triggered policies when the insured's limit was highest." Garcia, 876 S.W.2d at 855. In this case, that is $1 million.

### 2. Defense Costs

The policies in question are "eroding" policies. Liability insurance policies often have two components: defense and indemnity. In many liability policies, the policy limits refer only to the indemnity obligation (i.e., the duty to pay covered claims), and the obligation to defend a liability suit is not capped by the policy limits. In an eroding policy, by contrast, the insurer's payments to defense counsel to defend the liability suit count against the policy limits. Westchester Fire Ins. Co. v. Admiral Ins. Co., 152 S.W.3d 172, 192 (Tex. App.§§Fort Worth 2004, pet. denied). For example, if the eroding policy limits are $10,000, and the insurer pays $10,000 in reasonable defense fees, the policy limits for that occurrence are exhausted.

Thus, in the Garcia case, the focus of the inquiry was the indemnity obligation, because the duty to defend did not have a policy limit. Here, the

---

American wished to bring any other relevant evidence before the district court, it could have done so.

three policies do have a limit on defense costs because those costs, including attorneys' fees, are included in the "per medical incident" limits.

North American argues that even if the Garcia anti-stacking rule applies to prevent stacking for indemnity purposes, it should allow stacking for defense purposes. North American cited no cases for this proposition and acknowledges that there are few cases nationwide addressing eroding policies at all, much less in the context of stacking. It suggests, then, that even if Garcia requires the insured to select one policy under which obligations would be measured, we should allow the insured to select one policy for indemnity and another for defense, because of the eroding nature of the policies.

North American makes two arguments in support of this contention, unsupported by any precedent. First, North American argues that fairness dictates that the insured should get the benefit of having paid multiple premiums over the years. This argument would make sense if the Carr family were the only potential claimant in any of those years. But insurance is purchased to cover unintended, unexpected events, few or many, year after year. An insured who buys car insurance every year for twenty-five years and never has an accident is not entitled to a refund of premiums. He received what he bargained for – insurance for each year.

Here, we have no information about other claimants, but it matters not whether they were few or many. The nursing home bargained for insurance year after year, and it received that insurance. If what it wanted was more coverage each year, it could obtain that by paying more – as it did by buying the excess policies for two of the three years. If it wanted higher primary policy limits, it could obtain that by paying more for increased coverage. What it did instead was insure itself temporally under policies providing that related incidents involving one injured person constitute one claim, whether year after year or within one year.

Even more importantly, if the insured wanted a policy that had an unlimited defense obligation, rather than an eroding one, it should have contracted for such a policy. North American's argument would actually give the nursing home the benefit of an additional $1 million in defense costs coverage, despite its failure to contract for that coverage. Thus, the "fairness" argument is unpersuasive.[14]

North American makes a second argument directed only at the Royal policies, citing the following policy language:

> The limits of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after Issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

North American argues that this language permits the limits to restart each year on a continuing medical incident, despite specific policy language to the contrary.

"Interpretation of insurance contracts in Texas is governed by the same rules as interpretation of other contracts. . . . [W]hen a contract provision makes a general statement of coverage, and another provision specifically states the time limit for such coverage, the more specific provision will control." Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 133-34 (Tex. 1994). Here, the policy specifically provides that all related medical incidents constitute one incident. The more general language quoted above does not purport to change this specific limitation; instead, it explains what generally happens to policy limits, including aggregate limits, if a policy is renewed or extended for an additional year or

---

[14] Additionally, under Garcia, the insured is entitled to select the policy that provides the most coverage from those potentially providing coverage, thereby allowing the insured to select an applicable year in which the individual or aggregate limits are the highest. Garcia, 876 S.W.2d at 855.

12

subset thereof. Thus, this language does not start a new limit of liability running in favor of the insured on the same medical incident.

## C. Subject-Matter Stacking

This leads us to North American's last stacking argument. North American impliedly concedes that the actual settlement it paid was for a claim covered under the HPL portion of the policy. However, North American argues for a stacking of sorts as to the CGL and HPL portions of each policy for defense costs. North American reasons that Heritage Housing's defense actually triggered the CGL portion of the policies in lieu of or in addition to the HPL policies.

Under Texas law, a duty to defend is determined under the "eight corners" rule. In Texas, "[t]he eight-corners rule provides that when an insured is sued by a third party, the liability insurer is to determine its duty to defend solely from terms of the policy and the pleadings of the third-party claimant. Resort to evidence outside the four corners of these two documents is generally prohibited." GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church, 197 S.W.3d 305, 307 (Tex. 2006). The duty to defend does not depend upon the truth or falsity of the allegations: "A plaintiff's factual allegations that potentially support a covered claim is [sic] all that is needed to invoke the insurer's duty to defend . . . ." Id. at 310 (citing Heyden Newport Chem. Corp. v. S. Gen. Ins. Co., 387 S.W.2d 22, 26 (Tex. 1965)). North American contends that, under the eight corners rule, Royal was obligated to defend Heritage Housing under the CGL portion of the policy. Thus, it argues that at least another $1 million in policy limits are available here.

North American's contention is based upon the argument that, until 2005, Texas law treated claims for faulty supervision in a health care setting as "ordinary," rather than "health care" negligence claims. Under this argument, the claims against Heritage Housing for inadequate staffing and funding were

13

not health care liability claims. Questions about what claims constitute health care liability claims often have arisen in Texas because health care liability claims are subject to strict pleading and proof requirements under Texas law. See TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.001-.507 (Vernon 2005) (replacing TEX. REV. CIV. STAT. ANN. art. 4590i (Vernon 2003)). Thus, the question of whether a claim was or was not a health care liability claim was important in contexts other than insurance. North American contends that the 2005 decision of Diversicare Gen. Partner, Inc. v. Rubio, 185 S.W.3d 842 (Tex. 2005) changed Texas law regarding what constitutes a health care liability claim, and made understaffing and underbudgeting claims "health care liability" claims for the first time. Thus, since the Carr litigation was defended before that date, North American reasons that the defense obligation should be viewed under the law existing at the time, making the claims against Heritage Housing CGL claims.

We need not decide whether subject-matter allocation of defense costs under an eroding policy is judged by the law at the time of defense or some time later, because North American's argument rests on a faulty premise. In fact, Rubio did not change Texas law. For at least a decade before Rubio, the Texas Supreme Court (and numerous intermediate appellate courts) had made clear that a plaintiff's legal theories and labels do not control the question of whether a claim is a health care liability claim subject to (then existing) Article 4590i, known as the Medical Liability and Insurance Improvement Act ("MLIIA"). Garland Cmty. Hosp. v. Rose, 156 S.W.3d 541, 543-44 (Tex. 2004) (citing authorities dating back to 1994).

> Plaintiffs cannot use artful pleading to avoid the MLIIA's requirements when the essence of the suit is a health care liability claim. . . . To determine whether a cause of action falls under the MLIIA's definition of a "health care liability claim," we examine the claim's underlying nature. . . . If the act or omission alleged in the complaint is an inseparable part of the rendition of health care services, then the claim is a health care liability claim. . . . One

14

> consideration in that determination may be whether proving the claim would require the specialized knowledge of a medical expert.

Id. These same standards were used to determine Rubio as they had been in numerous cases before. Given the many cases defining health care claims by substance rather than form, Rubio was not some revolutionary change in Texas law.

Under Texas law, HPL coverage like that in the Royal and Evanston policies provides for breaches of professional standards of health care, while CGL coverage provides for other non-care related negligence. See generally Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co., 141 S.W.3d 198, 201 (Tex. 2004) (addressing a professional services exclusion in a CGL policy). Mrs. Carr's suit was manifestly a claim alleging breach of professional care. North American points to a reference in Mrs. Carr's complaint to a corporate policy of underbudgeting and understaffing. However, this reference is not a claim of negligence unrelated to standards of professional care. It is not an actionable tort merely to underbudget or understaff. Rather, Mrs. Carr's allegation amounted to a claim of negligence because the alleged Heritage Housing policy of underbudgeting and understaffing caused the nursing home to deliver inadequate medical care to Mr. Carr. Indeed, the only way to know whether a nursing home is properly staffed is by resort to professional standards of care. This claim fell squarely within the HPL side of the policies at issue. The decision to defend the Carr case under the HPL coverage, rather than the CGL coverage, was proper, and North American's argument does not result in more coverage.

## IV. CONCLUSION

Texas law prohibits stacking policies that do not overlap to provide more coverage than the highest limits of any one policy. That rule applies to both the indemnity and defense portions of an eroding policy. Insureds who contract for

an eroding policy are not entitled to a more favorable stacking rule than insureds who pay more for an unlimited defense. The primary insurers in this case defended and paid under their HPL policies, and the presence of CGL coverage does not provide more coverage for this medical incident. The district court's order granting summary judgment to Evanston and Royal is AFFIRMED.